JOHN L. LOCKE AND IRENE F. LOCKE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4608-74.    Filed February 23, 1976.

*Dwight J. Drake,* for the petitioners.
*Charles L. Eppright,* for the respondent.

1006

## OPINION

The petitioner seeks to deduct as ordinary and necessary expenses incurred in a trade or business, within the meaning of section 162, legal expenses incurred in defense of an action brought against him under section 78j of title 15 of the United States Code, as implemented by rule 10b-5 of the Securities and Exchange Commission.

Section 78j, title 15, of the United States Code, relating to manipulative and deceptive devices, provides, in part, as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. ·

The Securities and Exchange Commission has, pursuant to this statute, issued regulations relating to employment of manipulative or deceptive devices. These regulations have the effect of law. Rule 10b-5 thereof provides, in part, as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails * * *

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The facts are not generally in dispute. Petitioner was a prominent businessman and civic leader. His trade or business was that of "corporate executive." As such, he served as chairman of the board and chief executive officer of a group of businesses owned or controlled by the Fisher family. Petitioner was the son-in-law of O. D. Fisher, who had developed these businesses. Petitioner had obtained a position of leadership in the Fisher family enterprises. As such, he was closely associated with the operations of the various businesses in which the Fisher family had an interest, and his advice and consultation were sought in connection therewith.

The members of the Fisher family owned a substantial interest in Louisiana Long Leaf Lumber Co. O. D. Fisher was chairman of the board. Prior to May 1966, petitioner did not have any official connection with Long Leaf. He merely owned, with his wife, 3 shares of the common stock. However, due to his relationship with O. D. Fisher, a gentleman of advanced years, petitioner was invited from time to time to sit in on meetings of its board of directors. In the course of such meetings, consideration was given to the possible future of Long Leaf.

One Raymond B. Callahan was the income beneficiary of a trust owning 115 shares of common stock of Long Leaf. On March 15, 1966, Callahan wrote a letter to the petitioner requesting certain information with respect to Long Leaf. The petitioner promptly replied, outlining the situation with respect to the future of Long Leaf and, in an effort to influence Callahan against selling the stock, stated that petitioner would be willing to pay $1,000 per share for such stock. In a letter dated April 20, 1966, Callahan treated the petitioner's reply as an offer to purchase the stock held in the trust for $1,000 per share and indicated his acceptance of that offer. As a result, petitioner and his wife purchased the 115 shares of common stock in the trust for an agreed price of $115,000.

As a result of negotiations, which had been pursued intermittently for some months previously, an agreement was reached under date of November 15, 1966, pursuant to which Boise Cascade Corp. would purchase the stock of Long Leaf at a price of approximately $6,500 per share. That agreement was duly con-

summated, and early in 1967 the petitioner sold the 115 shares of Long Leaf, as well as the 3 shares previously owned, to Boise Cascade Corp. for $804,912.65.

Upon learning of the sale, the bank and Callahan brought suit against the petitioner, alleging that the petitioner had committed fraud in failing to advise them of the pending negotiations with Boise Cascade Corp. The cause of action was predicated on rule 10b-5 of the Securities and Exchange Commission. In the suit, the plaintiff sought to recover the difference between the amount paid for the stock by the petitioner and the amount for which the stock was sold to Boise Cascade Corp., together with punitive damages. The petitioner was thus threatened with a claim in the amount of $674,646.35 with interest, plus punitive damages.

The suit was vigorously contested by the petitioner and at no time did he consider settlement. In a trial on the merits, the factual issues were submitted to the jury and the jury found for the petitioner. It is the legal expense of petitioner's successful defense of this claim which is in issue.

The petitioner claims the right to deduct the legal expenses incurred in the suit against him on the grounds that (a) such expenses were incurred in his trade or business as a corporate executive, and (b) such expenses were ordinary and necessary in order to preserve his reputation as a corporate executive, which was endangered by the claim of fraud asserted in this litigation.

In his argument, petitioner construes *Woodward v. Commissioner,* 397 U.S. 572 (1970), and related cases as being limited to situations where the "origin of the claim litigated is in the process of acquisition itself." See also *Vincent Boagni, Jr.,* 59 T.C. 708 (1973); *Richard Baier,* 63 T.C. 513 (1975). Petitioner argues that the litigation with Callahan arose after the stock had been purchased, and was predicated not upon the purchase itself, but upon petitioner's position as a "corporate executive insider," and the action was in tort, based on rule 10b-5. Petitioner cites *Mitchell v. United States,* 408 F.2d 435 (Ct. Cl. 1969).

This argument would seem to beg the question. Even assuming that petitioner's alleged failure to inform can be divorced from his purchase of the stock, for such failure to give rise to a cause of action based on rule 10b-5 it was not necessary that petitioner be either an officer, director, or stockholder of Long Leaf. See *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974). To be an "insider" such relationship is not requisite. Petitioner's admitted status as an

"insider" within the meaning of rule 10b-5 resulted from a personal relationship with O. D. Fisher and the members of the Fisher family. His trade or business as a corporate executive was not predicated upon any relationship to Long Leaf, and petitioner derived no income therefrom, except to the extent that he received dividends on the 3 shares of common stock he and his wife then owned. As distinguished from the *Mitchell* case, *supra,* there was no alleged breach of duty by the petitioner as a corporate executive of Long Leaf.

Secondarily, petitioner claims the right to deduct the legal expenses as an ordinary and necessary expense incurred to protect his business reputation. See, e.g., *Paul Draper,* 26 T.C. 201 (1956); *J. Raymond Dyer,* 36 T.C. 456 (1961). The petitioner was unable to testify. However, in an effort to establish that petitioner's primary motive in contesting the lawsuit was to protect his reputation, his counsel testified to the effect that petitioner was more concerned over the impact of the lawsuit on his business reputation than was his concern over the potential monetary loss. Nevertheless, counsel admitted that both were factors. At another point in his testimony, in describing petitioner's business achievements, his counsel characterized him as a "Scotchman," speaking both ethnically and in habit. The fact that petitioner had an estate valued "in the millions" was no proof that he would not be concerned over giving up a profit of some $675,000. On the contrary, some of the nation's most wealthy men have been noted for their frugality.

While the action was brought by Callahan under rule 10b-5, and as such may be an action in tort, there can be no dispute with respect to the real purpose of the lawsuit. Callahan contended that he had been induced to sell the stock to the petitioner for a fraction of its value as a result of petitioner's failure to disclose facts within his knowledge. Callahan sought a monetary judgment. Petitioner elected to contest that claim. While the outcome of the litigation might affect petitioner's reputation, it also affected his "pocketbook." As distinguished from the *Boagni* case, *supra,* there is no basis for allocating a portion of the legal expense to the defense of petitioner's reputation and a portion of the legal expense to the gain realized by the petitioner as a result of the purchase of the stock. In this case the two are inseparable.

When petitioner wrote to Callahan, he did not have any business relationship either to Long Leaf or to Callahan. He was

acting in a personal capacity. He also purchased the stock in that capacity. The legal expenses incurred in defending that purchase must be treated as capital expenditures. See, e.g., *Madden v. Commissioner,* 514 F.2d 1149 (9th Cir. 1975); *Estate of Meade v. Commissioner,* 489 F.2d 161 (5th Cir. 1974), cert. denied 419 U.S. 882 (1974); *Munn v. United States,* 455 F.2d 1028 (Ct. Cl. 1972); *Ransburg v. United States,* 440 F.2d 1140 (10th Cir. 1971); *Anchor Coupling Co. v. United States,* 427 F.2d 429 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971).

In the alternative, the petitioner contends that if the legal expenses are deemed to be capital expenditures, the tax for the year of sale must be recomputed under section 1341 in order to reflect the resulting loss. That section provides, in part:

SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT.

(a) GENERAL RULE.—If—

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to—

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

The petitioner recognizes that section 1.1341-1(h), Income Tax Regs., specifically excludes legal fees and other expenses incurred by a taxpayer with respect to an item previously included in income from the adjustment provided for in section 1341. Nevertheless, petitioner argues that equity would require such adjustment, since the legal expense which is not allowed as a current deduction would be chargeable to the basis or cost of the stock, thereby reducing the gain previously reported by the petitioner. This argument must be addressed to the Congress.

*Decision will be entered for the respondent.*