REDWOOD EMPIRE SAVINGS AND LOAN ASSOCIATION (FORMERLY MENDOCINO-LAKE SAVINGS AND LOAN ASSOCIATION), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6628–75. Filed September 28, 1977.

*Paul E. Anderson,* for the petitioner.
*John E. Lahart,* for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in petitioner's corporate income taxes for the taxable years ending December 31:

| Year | Deficiency |
|------|------------|
| 1969 | $11,172.00 |
| 1970 | 9,063.34 |
| 1971 | 1,607.85 |
| 1972 | 48,573.52 |
| Total | 70,416.71 |

Certain concessions having been made by the parties, three issues remain to be decided.

First, whether the Malibu Springs Ranch was held by petitioner as a capital asset or as property "primarily for sale to customers in the ordinary course of [its] trade or business" under section 1221(1), I.R.C. 1954.[1] Dependent upon resolution of this question is the characterization of the loss on the sale of the property in 1972.

Second, whether the loss on the sale of the Malibu Springs Ranch is entitled to ordinary loss treatment under the doctrine of *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46 (1955).

Third, whether the legal expenses paid in 1970, 1971, and 1972, and the settlement payment in the amount of $300,000 made in connection with the Roda lawsuit are deductible under section 162(a) or are nondeductible capital expenditures.

### FINDINGS OF FACT

Certain facts have been stipulated and are so found.

Petitioner is, and at the time of the filing of the petition herein was, a California corporation with its principal office in Ukiah, Calif. It is a California savings and loan association

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.

as defined in section 5004 of the California Financial Code. From 1964 through 1972 petitioner's Federal corporate income tax returns were filed under its then business name Mendocino-Lake Savings & Loan Association. Petitioner, using the cash method of accounting, filed its tax returns for the calendar years 1969 and 1970 with the Director, Internal Revenue Service Center, Ogden, Utah. Its returns for the calendar years 1971 and 1972 were filed with the Director, Internal Revenue Service Center, Fresno, Calif.

On July 23, 1973, petitioners filed with the Internal Revenue Service an application for tentative refund of taxes paid for the taxable years 1969 through 1971 based upon a claim of a net operating loss carryback from the year 1972, which claim was allowed and paid by respondent.

During the period January 1, 1964, through February 4, 1968, 14,450 shares of the 15,000 shares of stock of petitioner outstanding were owned by Mendocino Financial Corp., a California corporation. During the same period, 14,300 shares of the 15,000 shares of stock outstanding of Mendocino Financial Corp. were owned by Henry Kersting. Kersting was chairman of the board of directors of petitioner and Mendocino Financial Corp. and was president of Mendocino Financial Corp. from January 1, 1964 through December 31, 1966.

On November 2, 1964, J. C. Gamm, Kersting's father-in-law, agreed to purchase approximately 400 acres of unimproved realty, the Malibu Springs Ranch, from John W. and Fern T. Roda. This property is located approximately 4 miles from the Pacific Ocean in an area of Los Angeles and Ventura counties known as Malibu Canyon. Petitioner's principal office in Ukiah is about 120 miles north of San Francisco and the Malibu Springs Ranch is about 500 miles south of Ukiah. An appraisal of the Malibu Springs Ranch in 1964 determined its value to be $556,800. The purchase price was $600,000 of which $60,000 was paid in escrow and a balance of $540,000 was paid by promissory note dated November 27, 1964, executed by the Gamms, Henry Kersting, and his wife, Ute, payable in 15 years at 6–percent interest. This note was secured by a pledge of the Mendocino Financial Corp. stock owned by Kersting; it was not secured by a deed of trust on the property.

In a "take out" commitment dated November 24, 1964, and executed pursuant to the agreement for sale, Mendocino Financial Corp. agreed to purchase from the Rodas the $540,000 promissory note on the occurrence of certain conditions, including default. The promissory note from the Gamms and the Kerstings to the Rodas was not paid.[2]

Several weeks later, on December 4, 1964, petitioner purchased the Malibu Springs Ranch from the Gamms for $455,752. Petitioner sold the property back to the Gamms on August 9, 1966, for $550,000, reserving an option to repurchase the property for $640,000 on or before June 27, 1967. The option was not exercised. Petitioner reacquired the property from the Gamms on July 21, 1967, for $750,000.[3] The reacquisition of the Malibu Springs Ranch was entered on petitioner's books and records under the account No. 162–1, "real estate owned—unimproved (Section 6705)."[4]

The following capital expenditures were incurred by petitioner in connection with the Malibu Springs Ranch:

| Date | Amount | Purpose |
|---|---|---|
| Aug. 29, 1967 | $1,781.63 | Title insurance policy |
| May 9, 1968 | 100.00 | Slope analysis |
| July 24, 1968 | 1,000.00 | Road improvement |

---

[2] Sometime prior to 1968 Kersting had pledged the stock of petitioner owed by Mendocino Financial Corp. as security for a loan of $1,500,000 to the Mendocino Financial Corp. from the Central States Southeast and Southwest Areas Pension Fund. When Mendocino Financial Corp. defaulted on the loan the pension fund foreclosed on petitioner's stock and became the owner of 14,450 shares of petitioner's stock. In November of 1967 Ira Brannon replaced Kersting as president and chief executive officer of petitioner. Mendocino Financial Corp. became bankrupt and Kersting severed all connections with petitioner in the latter part of 1967 or early 1968.

[3] The record is not clear on whether all of these amounts were actually paid by the purchasers to the sellers. Apparently, at least a part of the $455,752 owed by petitioner to the Gamms on the first transaction was credited on the $550,000 the Gamms were to pay petitioner in the 1966 transaction—but there is no evidence that petitioner received the balance of the purchase price. The parties do agree, however, that petitioner actually paid the Gamms $750,000 when it reacquired the property in 1967 and that that amount is includable in petitioner's basis in the property.

[4] Sec. 6705 of the California Financial Code permits savings and loan associations to invest in real property to be used for housing veterans and elderly people or for urban renewal which would not otherwise be permitted. See further discussion, *infra*.

| Mar. 22, 1971 | 2,500.00 | Partial payment for feasibility study |
| June 2, 1971 | 2,500.00 | Balance payment for feasibility study |

Expenditures were made on the basis of what petitioner considered prudent action in order to effectively market the property.

Petitioner, as a California savings and loan association, was subject to the provisions of the California Financial Code, sections 5000, et seq. Petitioner's accounts were insured by the Federal Savings & Loan Insurance Corp., which also made it subject to regulation by the Federal Home Loan Bank Board.

The function of a savings and loan association is to encourage thrift and home ownership by attracting savings deposits and investing those funds in loans on the security of residential real estate at a higher interest rate than that paid on the savings accounts. During the period with which we are concerned, as a general rule a savings and loan association was limited to making loans within its lending area, which was the area within 100 miles of its principal office. Procedures existed for obtaining prior approval of loans or properties outside the lending area.

Under the California Financial Code savings and loan associations were permitted to own only three types of real estate, i.e., (1) association premises, (2) property acquired pursuant to section 6705, and (3) property acquired under section 6707 in settlement of loans either through foreclosure or deed in lieu thereof. Section 6705 permits a savings and loan association to acquire unimproved land for the purpose of providing housing for veterans and the elderly and for urban renewal or improvement. Investment in section 6705 property is limited to 5 percent of the association's net assets. Savings and loan associations normally invest in section 6705 property to generate loans from themselves.

Typically, a savings and loan association will purchase unimproved real estate and subdivide it. It can either sell the lots and finance the purchaser for construction or build on the property and sell the completed structures. It can also purchase subdivided property and resell the individual lots.

Another method of developing potential loans is through "take-out" commitments which are issued by a savings and loan association to an interim financer by which the savings and loan association agrees to make a loan to the borrower in the future. A take-out commitment is given ordinarily in a transaction in which lots are sold to a builder who will secure a construction loan, build, and sell the property with the savings and loan association negotiating with the purchaser for a new loan.

Another technique utilized is "warehousing" whereby a savings and loan association will purchase real estate in which a developer is interested and hold the property for a certain period of time at the end of which the property will either be developed or sold to the developer.

Petitioner has owned and financed buyers of section 6705 property both before and after the sale of Malibu Springs Ranch. Three of these properties were acquired in 1967 and sold in 1969, two of them at a gain and one at a loss. All three sales were reported by petitioner as capital transactions for tax purposes. Another property was acquired by petitioner in 1966 and was sold at a loss in 1974. The loss was reported as ordinary. A fifth such property was acquired in 1974 and was sold at a gain in 1975, the gain being reported as ordinary income.

On August 24, 1967, petitioner was informed by the California Savings and Loan Commission that some of its transactions involving section 6705 property were illegal and demonstrated that its business was being conducted in an unsafe manner; petitioner was ordered to desist from engaging in any transactions with reference to any properties then owned without prior written consent from the Commission. On November 15, 1968, the Federal Home Loan Bank Board ordered that petitioner acquire no properties under section 6705. The two orders did not affect petitioner's efforts to dispose of the Malibu Springs Ranch; they were not construed as a prohibition on the disposition of properties already owned by petitioner.

Ira N. Brannon was elected president of petitioner on November 6, 1967. He actively attempted to dispose of the Malibu Springs Ranch in any way possible.

Petitioner listed the Malibu Springs Ranch with John J. Cox of California Motel Investments, Inc., from February 26, 1968, to September 30, 1968. The listing was given to Robert Adamson of Robert Adamson Realty from October 30, 1968, to July 31, 1970. Brannon was in frequent contact with Cox, Adamson, and other brokers who were attempting to dispose of the property. The Malibu Springs Ranch was advertised for sale in the Wall Street Journal on June 7, 1968, and in the Los Angeles Times on December 16, 1968, and April 21, 1970. In 1969 Robert Adamson Realty prepared a brochure containing general information about the Malibu Springs Ranch and the surrounding area and sales information. A "For Sale" sign was on the property. Brannon discussed the possibility of subdividing the property with petitioner's board of directors and John Cox. He also explored the feasibility of developing the property as a recreation vehicle park. In 1971, petitioner contracted with the Sanford R. Goodkin Research Corp. for a marketing and feasibility study to aid in the sale of the property and to determine whether petitioner would pursue direct development as a recreation vehicle park. A slope analysis of the property was performed at petitioner's request in April 1968. For various reasons none of the proposed uses of the property by petitioner was deemed feasible or pursued by petitioner.

The realtors sent out numerous letters to prospective buyers during the years 1967–71 and petitioners received several offers to buy the property for prices ranging from $250,000 to $330,000; however, none of those offers were acceptable to petitioner for various reasons.

On April 9, 1970, petitioner requested authorization from the Federal Home Loan Bank Board to make loans on the Malibu Springs Ranch, which was necessary because the property was situated outside petitioner's approved geographical lending area of 100 miles. At that time rules and regulations for the insurance of accounts established particular lending areas and procedures for obtaining prior approval for loans on properties outside the lending area. On May 4, 1972, the Federal Home Loan Bank Board informed petitioner that no objection would be made to its financing the disposal of the Malibu Springs Ranch if the transaction was a bona fide salvage operation of property which petitioner voluntari-

ly acquired. Petitioner considered disposal of the Malibu Springs Ranch a bona fide salvage operation.

The Malibu Springs Ranch was sold to Lawrence W. Field (title assigned to Malibu Springs Ranch, a limited partnership) in June 1972 for $277,539 by payment of $20,000 in escrow and the balance by promissory note executed in favor of petitioner.[5] The promissory note was refinanced by petitioner in 1974 in accordance with the sale agreement in order to conform to California Financial Code sections 6705 and 6705.1. The Malibu Springs Ranch was the only sale or acquisition of section 6705 property by petitioner during 1972.

On its income tax return for 1972 petitioner reported an ordinary loss in the amount of $514,464 on the sale of Malibu Springs Ranch. In his notice of deficiency respondent determined that the loss on the transaction was a capital loss.

On February 23, 1968, the Rodas commenced a civil action against petitioner and others in the Los Angeles County Superior Court. A first amended complaint was filed on December 23, 1968. The complaint prayed for payment on the promissory note plus interest, exemplary and punitive damages of $600,000, for personal liability of each of the defendants on an alter ego theory, for a vendor's lien requiring the Malibu Springs Ranch to be sold if it was determined that the Rodas did not have title, for a nullification of the transaction because of securities violations, and for title to the property as beneficiaries of a constructive trust in which petitioner and others were trustees. The complaint further prayed that the court declare title to the property and enter an order compelling the transfer of legal title and possession to the Rodas.

The Rodas filed a lis pendens notification in the Los Angeles and Ventura County recorder's office pursuant to California Civil Procedure Code section 409. Petitioner filed a motion to expunge the lis pendens pursuant to Cal. Civ. Proc. Code section 409.2. The motion was granted on the condition that an undertaking of $285,000 be posted by the Central

---

[5] Although stipulation 36 states that the sale took place on May 15, 1972, this appears to be incorrect after examination of Ex. 40. Escrow was not expected to close until June 23, 1972, and the unrecorded grant deeds are dated June 21, 1972. The record is not at all clear on the exact date of transfer but the point is not a critical fact.

States Southeast and Southwest Areas Pension Fund which effectively owned petitioner at this time. The final order expunging the lis pendens was granted in 1969.

Alan Mund, petitioner's counsel, recommended that petitioner settle the lawsuit in order to preserve petitioner's business. He advised petitioner that the alter ego theory was likely to succeed and petitioner could be reached for a cash judgment of approximately $1,500,000 for fraud. At that time petitioner's financial statement would not have permitted a judgment against it in this amount and petitioner would not have been able to obtain the funds to pay such a judgment.

Sometime during the spring of 1972, petitioner offered the Rodas return of the property free and clear in settlement of the suit. The offer was refused. The Rodas demanded $600,000 to $750,000. In the fall of 1972 the trial judge locked counsel for the parties in a room and instructed them to reach a settlement. A settlement of $300,000 was reached, and on November 3, 1972, the Rodas and petitioner executed an "Agreement of Settlement of Lawsuit and Mutual General Release."

Petitioner paid the Rodas $300,000 in 1972 and deducted the amount as an ordinary and necessary business expense on its 1972 income tax return. Legal fees in the amounts of $2,454.64, $9,028.67, and $26,240.59 were paid by petitioner in 1970, 1971, and 1972, respectively, in connection with the lawsuit and were deducted for the same respective years as ordinary and necessary business expenses.

In his notice of deficiency respondent determined that the amounts paid in settlement of the lawsuit and for legal fees were incurred in connection with the Malibu Springs property and represented capital expenditures which were additions to the cost of the property.

Since petitioner reported no capital gains for 1972 the disallowance of the loss on the sale of the property, the settlement, and the legal fees as ordinary expenditures left petitioner with taxable income for 1972 and no operating loss carryback to the years 1969, 1970, and 1971.

## OPINION

The first issue to be decided is whether petitioner is entitled to an ordinary loss or a capital loss on the sale of the Malibu

Springs Ranch. Petitioner presents two theories in support of its assertion that ordinary treatment is required. First, that the property was held by petitioner for sale to its customers in the ordinary course of its business, thereby falling within the section 1221(1) exception to the definition of capital assets; second, even if section 1221(1) does not apply, because the property constituted a source of loans for petitioner, the doctrine enunciated in *Corn Products Refining Co. v. Commissioner, supra,* requires that ordinary treatment be accorded the loss.

With regard to the application of section 1221(1), three separate arguments are made by petitioner. First, it contends that California Financial Code section 6705 property is inherently property held primarily for sale to customers in the ordinary course of its business of making loans for housing. Essentially, it wants a ruling that section 6705 property is, as a matter of law, covered by section 1221(1). Consequently, an asset-by-asset approach is not necessary nor is delving into the particular facts surrounding the sale of the Malibu Springs Ranch.

A savings and loan association, under California law, may hold real property acquired for its own occupancy,[6] and it may hold real property acquired as a result of default on a loan or in satisfaction of a loan for which the property is security.[7] Aside from those circumstances, however, a savings and loan association may invest directly in real property only under the authority of section 6705.[8] Brannon testified that the

---

[6] Cal. Fin. Code sec. 6702 (West Supp. 1977), amending Cal. Fin. Code sec. 6702 (West 1968); Cal. Fin. Code sec. 6710 (West 1968).

[7] Cal. Fin. Code sec. 6707 (West 1968). Petitioner, between 1968 and 1972, disposed of approximately $2-million worth of sec. 6707 property. It would either sell these properties as is or after improvements were made. The properties were sold as rapidly as possible.

[8] Cal. Fin. Code sec. 6705 (West Supp. 1977), amending Cal. Fin. Code sec. 6705 (West 1968), provides:

Sec. 6705. Payments under lease in lieu of royalties

An association may invest in real property and such investment may include subdividing and developing real property and building homes and other buildings on such property principally for residential use by veterans, housing for the elderly, or urban renewal or improvement. An association may own, rent, lease, manage, operate for income, or sell such property. Investments of an association under this section, and loans by the association under the authority of Sections 6705.1, 6705.2, 6705.4 and 6705.6 which loans except for the provisions thereof do not comply with the provisions of this part for original loans, shall not at any one time aggregate more than whichever of the following is lesser:

primary purpose for a savings and loan association to invest in section 6705 property is to develop housing and generate loans within the parameters provided in section 6705. This can be accomplished by several different routes. The property may be developed by the association itself and the lots sold to purchasers who finance the purchase through the association. Or, the development can be done by others with loans being generated through warehousing agreements to takeout commitments. Thus property acquired by an association under section 6705 may well be property held by the association primarily for sale in the ordinary course of its business. However, the mere fact that an association justifies acquisition of real property under section 6705, and labels it section 6705 property, does not automatically qualify it as property held primarily for sale to customers in the ordinary course of its business. For tax purposes at least that would depend on the actual purpose for which the property was acquired, held, and sold. If it can be shown objectively that the property was acquired principally for development of residential property for use by veterans or the elderly, or for urban renewal or development, it would probably be classified as business property. But absent some such showing, we cannot classify it as business property within the exception of section 1221(1) of the Internal Revenue Code simply because it is labeled section 6705 property, and we reject petitioner's first argument.

Petitioner cites *Burbank Liquidating Corp. v. Commissioner,* 39 T.C. 999 (1963), affd. in part and revd. on other grounds 335 F.2d 125 (9th Cir. 1964), in support of its position. In that case we held that the taxpayer's gain on the sale of lots from property acquired under section 6705 of the California Code was ordinary income rather than a capital gain. However, we found as facts that the taxpayer there originally acquired the property for sale in the ordinary

---

(a) Five percent of its total assets.

(b) * * * Its statutory net worth.

Unless a savings and loan association has a lessor's interest, it may not hold investments made pursuant to sec. 6705 for more than 5 years absent approval of the Savings and Loan Commissioner, Cal. Fin. Code sec. 6706 (West 1968). Savings and loan associations are authorized to make loans on the security of sec. 6705 property to finance its sale or improvement although the amount and maturity date are subject to statutory limitations. Cal. Fin. Code secs. 6705.1, 6705.2, 6705.5, and 6706.6 (West 1968).

course of its business and that this intent was not altered prior to sale of the property. If petitioner's argument that all property bought by an association under the authority of section 6705 automatically qualifies as business property is correct, it would not have been necessary for us to make that finding.

Petitioner's contention is not supported by case law or logic. Consequently, the tax treatment of the loss sustained by petitioner on the sale of Malibu Springs Ranch must be determined under the guidelines established in numerous Federal tax cases involving this issue, without the benefit of any presumption derived from section 6705 of the California Code.

Section 1221(1) of the Internal Revenue Code provides an exception to the definition of capital asset for "(1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;" whether a particular property falls within the exception is a factual question involving consideration of all the pertinent facts and circumstances. *Higgins v. Commissioner*, 312 U.S. 212 (1941); *South Texas Properties Co. v. Commissioner*, 16 T.C. 1003 (1951). As explained in *Malat v. Riddell*, 383 U.S. 569, 572 (1966):

> The purpose of the statutory provision * * * is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * * We hold that, as used in §1221(1), "primarily" means "of first importance" or "principally."

Various factors that should be considered in answering the question have been mentioned in numerous cases; e.g., *United States v. Winthrop*, 417 F.2d 905 (5th Cir. 1969); *Adam v. Commissioner*, 60 T.C. 996 (1973); *Howell v. Commissioner*, 57 T.C. 546 (1972). No one of those factors is conclusive; rather, the totality of the facts in each individual case controls. *Ayling v. Commissioner*, 32 T.C. 704 (1959). We believe the more important factors for consideration in this somewhat unique case are: (1) The taxpayer's purpose in acquiring, holding, and selling the particular property; (2) how the acquisition and sale of this particular property would fit into the taxpayer's business-related real estate activities; and (3)

the taxpayer's activities with respect to the property to accomplish the avowed purpose.

As we understand it, the principal business activity of petitioner, as a California savings and loan association, was to receive depositors' savings and reinvest those funds at higher interest rates than it paid on its depositors' deposits. Most of its lending was on the security of real estate; so one of its objectives was to generate real estate loans. As a general rule a savings and loan association was limited to making loans within its lending area, which was within 100 miles of its principal offices. Buying and selling real estate was not petitioner's principal business, although it was engaged in at times to promote its lending business. However, its real estate activities were somewhat limited and controlled by the California Financial Code and the regulations of the Federal Home Loan Bank Board with respect to loans insured by the FSLIC. Under the California Financial Code it could acquire real estate for its own use, it could acquire real estate in settlement of loans, and under section 6705 of the California Financial Code, it could:

invest in real property and such investment may include subdividing and developing real property and building homes and other buildings on such property principally for residential use by veterans, housing for elderly, or urban renewal or improvement. * * *

It was limited to holding section 6705 property for a period of 5 years.

We have no direct evidence of the purpose for which petitioner acquired the Malibu Springs Ranch property; Kersting, who made the decisions with respect to the first acquisition and then the reacquisition of this property, was apparently not available as a witness. We must therefore look to what objective evidence we have to determine that purpose, and this we do against the backdrop of petitioner's normal business activities as stated above.

Kersting originally arranged to have the property purchased from the Rodas in the name of his in-laws, the Gamms, who lived in Germany, on November 2, 1964, for a purchase price of $600,000. A $60,000 downpayment was made and a note was given for the balance, secured only by a pledge of Kersting's stock in Mendocino Financial Corp. and Kersting's personal guarantee. Apparently the principal asset

of Mendocino Financial Corp. was 14,500 shares of petitioner's predecessor's stock, which had previously been pledged as security for a loan from the Central States Southeast and Southwest Areas Pension Fund to Mendocino Financial Corp. Apparently no payments were made on the note to the Rodas and the pledged stock of Mendocino Financial Corp. provided scant security for the balance of the purchase price. On December 4, 1964, just 1 month after the Gamms purchased the property from the Rodas, petitioner purchased the property from the Gamms for $455,752. Two years later, on August 9, 1966, petitioner sold the property back to the Gamms for $550,000. Then 1 year later, on July 21, 1967, petitioner reacquired the property from the Gamms for the seemingly exorbitant price of $750,000. We have no evidence on whether any money actually exchanged hands in the earlier transactions between petitioner and the Gamms, but the parties agree that petitioner actually paid the $750,000 purchase price on the final transaction on July 21, 1967. After that transaction the Gamms (or Kersting) had $750,000 of petitioner's cash, the Rodas had received only $60,000 of their sales price from the Gamms (or Kersting), and petitioner owned the Malibu Springs Ranch for which it had paid a price apparently far in excess of its value. Looking at the above transactions objectively suggests that the principal purpose for the acquisition of the property by petitioner was to permit Kersting to bilk the Rodas out of their property for $60,000 and to permit Kersting to withdraw $750,000 in cash from petitioner in exchange for the property for which he had actually paid only $60,000.

But assuming that Kersting was acting in behalf of petitioner when petitioner reacquired the property in 1967, do the objective facts indicate that petitioner acquired the property for sale to its customers in the ordinary course of its business?

We recognize that petitioner could acquire real estate such as this for development and sale within the parameters of section 6705 of the California Financial Code, and that such an acquisition might well be within the ordinary course of the business of a savings and loan association, i.e., to generate real estate loans. However, we fail to see how this could have been petitioner's purpose in acquiring this particular proper-

ty. The property was 500 miles away from petitioner's principal office and it would have required approval of the FHLBB for it to make loans on individual lot sales even if it had subdivided and developed the property for sale; and it is rather unlikely that many individual purchasers would have carried loans with a lending agency so far removed. We also believe it would have been without the scope of petitioner's authorized business to enter into the real estate development business per se, unless it was for the purposes mentioned in section 6705, and we have no evidence of any activity in that direction. And the fact that petitioner had bought and sold other section 6705 properties does not convince us that a part of petitioner's regular business was buying section 6705 properties for sale to its customers in the ordinary course of its business. In fact its three sales of section 6705 property acquired in 1967 and sold in 1969 were reported as capital transactions for tax purposes. The evidence does not support a finding that the Malibu Springs Ranch was acquired by petitioner for sale to its customers in the regular course of its business.

Not long after petitioner reacquired the property in 1967 Kersting severed connections with petitioner and Ira Brannon became its chief executive officer. This was apparently at the direction of the pension fund which at that time became the principal stockholder of petitioner by virtue of foreclosure on its loan to Mendocino Financial Corp. Brannon inherited not only the overpriced property but also restrictions imposed by the California Savings and Loan Commission and the FHLBB against petitioner dealing in section 6705 property. Since Brannon believed that the restrictions did not prohibit petitioner from disposing of the Malibu Springs Ranch which it already owned, he immediately undertook efforts to dispose of the property. It seems clear that Brannon, acting for petitioner, made determined efforts to sell the property, using many of the usual sales procedures to attract buyers. The property was listed with several real estate brokers who prepared and distributed sales brochures about the property; it was advertised for sale in various newspapers and a "for sale" sign was placed on it; potential buyers were contacted by mail; efforts were made to have the property zoned to meet the requirements of one potential buyer; and a marketing and

feasibility study was made to determine the best use of the property. These are all sales activities that might be undertaken by an owner engaged in the business of buying and selling real estate. However, they are also sales activities that might be engaged in by an owner trying to dispose of an investment property for which too much money had been paid and the continued investment in which might jeopardize its regular business. We have no convincing evidence that petitioner actually attempted to subdivide and develop the property for any of the purposes mentioned in section 6705, nor that petitioner's primary purpose in attempting to sell the property was to generate loans. As the FHLBB informed petitioner in 1972, it had no objection to petitioner financing the disposal of Malibu Springs Ranch if the transaction was a bona fide salvage operation involving property which petitioner voluntarily acquired. Petitioner proceeded to sell and finance the purchase of the property on that basis. We conclude that petitioner's principal purpose in holding and disposing of the ranch property was to salvage what it could out of a bad investment, that the financing of the purchaser was an incidental part of the salvage operation, and that the ranch property cannot be classified as property held by petitioner primarily for sale to customers in the ordinary course of its business.

Petitioner also argues that the rationale of *Corn Products Refining Co. v. Commissioner, supra,* is applicable here and supports a holding that the loss on the sale of the ranch property should be accorded ordinary loss treatment. Its reasoning is that inasmuch as the dominant function of a savings and loan association is the generation of interest income on loans of deposited savings on the security of residential real estate, the acquisition and sale of section 6705 property by a savings and loan association is analogous to the commodities futures purchased in *Corn Products* to insure a source of supply, which the Court there held to be "closely geared to the company's manufacturing enterprise." We have found no cases in which the *Corn Products* rationale was applied to buying and selling land, and we have doubts about its applicability in such circumstances, but we need not rule on that here because petitioner's reasoning is based on an assumption which we have found not supported by the facts.

The assumption with which we disagree is that all real estate acquired and sold by petitioner and labelled section 6705 property was acquired for the purpose of generating loans and that such transactions are thus an integral part of petitioner's normal business operations. To the contrary, we have been unable to conclude on the evidence presented that petitioner's primary purpose in acquiring and selling the ranch property was to generate loans or to sell to customers in the ordinary course of its business. Thus, the rationale of *Corn Products* would not salvage petitioner's arguments even if applicable. And, as we said in *W. W. Windle Co. v. Commissioner*, 65 T.C. 694, 713 (1976):

> As we move from inventory-related corn futures to a more traditional form of capital asset, such as stock, we should be more reluctant to be innovative in further broadening the domain of subjective analysis and unpredictability. * * *

The second issue to be decided is the deductibility under section 162(a) of the settlement payment and the legal expenses incurred in connection with the Rodas' lawsuit. Petitioner argues they were incurred to protect petitioner's business against a large claim for fraud and are thus deductible as ordinary and necessary business expenses. Respondent determined that they were incurred to protect petitioner's interest in the Malibu Springs Ranch and were nondeductible capital expenditures.

Legal expenses incurred in defending a lawsuit charging fraud that would destroy a taxpayer's business have been held to be deductible as ordinary and necessary business expenses (*Commissioner v. Heininger*, 320 U.S. 467 (1943)), as have payments in settlements of actions brought or threatened on the basis of fraud which would have a deleterious effect on taxpayer's business. *James E. Caldwell, & Co. v. Commissioner*, 234 F.2d 660 (6th Cir. 1956), revg. 24 T.C. 597 (1955); *North American Investment Co. v. Commissioner*, 24 B.T.A. 419 (1931). See also *Pepper v. Commissioner*, 36 T.C. 886 (1961); *Helvering v. Hampton*, 79 F.2d 358 (9th Cir. 1935). However, legal expenses incurred to defend or perfect title to property are nondeductible capital expenditures (sec. 1.263(a)–2(c), Income Tax Regs.; *Boagni v. Commissioner*, 59 T.C. 708, 712 (1973)), as are payments made in settlement of litigation

engaged in to defend or perfect title or an interest in property. *Yates Industries, Inc. v. Commissioner,* 58 T.C. 961 (1972).

In determining whether litigation expenses are ordinary and necessary business expenses or capital expenditures, in recent years the courts have applied the origin-of-the-claim test first enunciated in *United States v. Gilmore,* 372 U.S. 39 (1963). See *Woodward v. Commissioner,* 397 U.S. 572 (1970); *United States v. Hilton Hotels Corp.,* 397 U.S. 580 (1970); *DeMink v. United States,* 448 F.2d 867 (9th Cir. 1971); *Anchor Coupling Co. v. United States,* 427 F.2d 429 (7th Cir. 1970); *Reed v. Commissioner,* 55 T.C. 32 (1970). In *Gilmore,* the Supreme Court said at page 49:

> For these reasons, we resolve the conflict * * * in favor of the view that the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was "business" or "personal" and hence whether it is deductible or not * * *

In *Woodward* the Court said at page 577:

> In our view * * * litigation expenses [involve] the simpler inquiry whether the origin of the claim litigated is in the process of acquisition itself.

In analyzing those two opinions the Seventh Circuit, in *Anchor Coupling Co. v. United States, supra,* concluded that the origin-of-the-claim test should be applied to determine whether a settlement constituted not only a capital versus business expense, but also a capital versus personal expense. In *Arthur H. DuGrenier, Inc. v. Commissioner,* 58 T.C. 931 (1972), we said at page 938:

> that the origin-of-the-claim test will characterize an expense as a capital expenditure if such expense is incidental to either the purchase or sale of an asset or is made to protect one's interest in an asset, regardless of the taxpayer's motives in making such payment. * * *

And in *Boagni v. Commissioner, supra,* this Court said at page 713:

> the Supreme Court enunciated the rule that in cases where the litigation involved the acquisition or disposition of capital assets, the origin and character of the claim, rather than the taxpayer's primary purpose in litigating the claim, are the controlling criteria in deciding whether the expenditure should be capitalized. This Court has extended the same rule to cases involving the defense or perfection of title to property. * * *

See also *Stoody v. Commissioner,* 66 T.C. 710, 714 (1976).

Against this background of case law we must examine the evidence in this case to determine the origin of the claim upon which the Roda suit was based and in connection with which the settlement was paid and the legal expenses incurred.

We think it is clear from the evidence that the Roda lawsuit arose out of the sale of the Malibu Springs Ranch and that the settlement was payment of a part of the purchase price for the Rodas' interest therein. The Rodas were seeking to recover the unpaid portion of the purchase money for which they sold the property to the Gamms or the recovery of title to the property itself. True, they also sought exemplary damages on the theory that the sale had been induced by fraud on the part of petitioner's alter ego. However, even the latter claim arose out of a capital transaction, the sale of the property. We have no evidence of exactly what the $300,000 settlement was paid for. Petitioner's attorney testified that he advised petitioner to settle to avoid the possibility of incurring an excessive judgment for damages on the alter ego theory, but petitioner's motive in making the payment is not controlling. *Stoody v. Commissioner, supra* at 714. We must look to the origin of the claim settled, which we find was primarily a claim to recover the unpaid portion of the purchase price of the property or the property itself. The Rodas did not testify but it stands to reason, and their amended complaint filed in the lawsuit supports it, that what they were seeking was payment for the property. At the time of the settlement petitioner held title to the property and had negotiated, or was negotiating, a sale of the property for slightly less than the settlement figure. Petitioner may have offered to give the property back to the Rodas in lieu of a cash settlement but the Rodas would not accept it. It therefore became incumbent on petitioner to pay the cash settlement to clear its title to the property so it could realize something out of the property by selling it to someone else. At least petitioner, upon whom lies the burden of proof, has not convinced us that the Rodas' claim was based on something that would directly affect petitioner's business aside from casting a cloud on the title to one of petitioner's assets.

We conclude that the amount paid by petitioner to settle the Rodas' claim and the legal expenses incurred in connec-

tion with that claim were capital outlays and are not deductible under section 162(a).[9]

Because of concessions made by each party,

*Decision will be entered under Rule 155.*

---

[9] While it may be of little solace to petitioner, in light ·of the fact that we have concluded that its loss of the sale of Malibu Springs Ranch was a capital loss, we do note that these payments in settlement of the suit and legal fees should be added to petitioner's basis in the property. See *Arrowsmith v. Commissioner,* 344 U.S. 6 (1952), and footnote on page 939 of our opinion in *Arthur H. DuGrenier, Inc. v. Commissioner,* 58 T.C. 931 (1972).