JAMES C. BRADFORD, SR., AND ELEANOR BRADFORD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JAMES C. BRADFORD, JR., AND LILLIAN BRADFORD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5701–76, 5831–76.[1]    Filed July 31, 1978.

*William Waller* and *Justin P. Wilson,* for the petitioners.
*W. Robert Pope, Jr.,* for the respondent.

HALL, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes:

| Docket No. | Taxable year | Deficiency |
|---|---|---|
| 5701–76 | 1972 | $81,005.75 |
| 5701–76 | 1973 | 135,628.94 |
| 5831–76 | 1973 | 11,320.41 |

Due to concessions made by petitioners, the issues for decision are:

(1) Whether payments by petitioners James C. Bradford, Sr., and James C. Bradford, Jr., in settlement of an SEC action brought under rule 10b–5 alleging insider trading with respect

---

[1]These cases were consolidated for purposes of trial, briefing, and opinion.

to their personal accounts, were capital expenditures or ordinary and necessary business expenses.

(2) Whether petitioners James C. Bradford, Sr., and Eleanor Bradford realized gain upon the transfer of stock to a trust where the transfer was conditioned upon the trustee's promise to pay the resulting Federal and State gift tax liability.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

All petitioners resided in Nashville, Tenn., at the time they filed their petitions herein.

During 1972 and 1973 James C. Bradford, Sr., (Bradford, Sr.), and James C. Bradford, Jr. (Bradford, Jr.), were securities dealers and investment bankers. Bradford, Sr., was also the managing partner in the broker-dealer firm J. C. Bradford & Co. and president of the broker-dealer firm J. C. Bradford & Co., Inc.[2] Bradford, Jr., was also involved with these broker-dealer firms as a principal partner and vice president.

In addition, Bradford, Sr., was president and a director of the investment adviser firm, Life Stock Research Corp.[3] (Life Stock). Bradford, Jr., was also a director of Life Stock as well as a director in Old Line Life Insurance Co. (Old Line) until August 1972. During 1971 and 1972 J. C. Bradford & Co. served as the principal market-maker in the common stock of Old Line.[4]

In October 1971, Gordon E. Crosby, Jr., chairman of U.S. Life Corp. (USLIFE), contacted Bradford, Sr., concerning the possible acquisition of Old Line by USLIFE.[5] At that time, Bradford, Sr., advised Crosby that he would oppose any offer which did not involve at least $50 for each Old Line share.

On April 19, 1972, Crosby telephoned Bradford, Sr., and stated that he was then in a position to work out a deal for the acquisition of Old Line on a basis of better than $50 per share. The same day Crosby wrote Bradford, Sr., and stated as follows:

---

[2]J. C. Bradford & Co., Inc., was wholly owned by the partners in J. C. Bradford & Co. in their individual capacities.

[3]J. C. Bradford & Co., Inc., owns 81 percent of the voting capital stock of Life Stock. The Bradford Foundation, a charitable trust, owns the remaining 19 percent.

[4]A market-maker is a specialist who handles the transactions in a particular security. Typically he offers and obligates himself to buy and sell a particular security at quoted prices.

[5]In 1961 Bradford, Sr., apparently put together a syndicate to purchase a controlling block of stock of Old Line, which the syndicate continued to own through 1972. See *Fridrich v. Bradford*, 542 F.2d 307, 309 (6th Cir. 1976).

Based upon the analytical work that we have completed, we [USLIFE] believe we are now in a position to offer an exchange ratio of 1 for 1 for 100% of Old Line Life.

* * * When my associate, Don Manuel, visited with you in Nashville on November 19, 1971, you apparently indicated that no consideration would be given to the possible sale of Old Line until such time as a price of somewhere around $50.00 could be realized. It would appear that developments have now been such that we can rather significantly exceed the prices you have previously mentioned.

On April 21, 1972, following receipt of the above letter from Crosby, Bradford, Sr., caused to be purchased for the account of his wife 2,000 shares of common stock of Old Line at an average price of approximately $34 per share. Between April 21 and April 26, 1972, Bradford, Sr., also caused to be purchased for the account of Life Stock 5,400 shares of common stock of Old Line at an average price of approximately $38 per share. In addition, on April 27, 1972, Bradford, Jr., after learning from his father of the April 19 conversation, purchased for his own account 1,225 shares of common stock of Old Line at $37 per share.[6]

On June 29, 1972, a press release was issued jointly by USLIFE and Old Line stating that a proposed merger of the two corporations was being considered. This release was the first public disclosure of USLIFE's interest in acquiring Old Line.

On November 10, 1972, the Securities and Exchange Commission (SEC) filed a complaint against Bradford, Sr., Bradford, Jr., J. C. Bradford & Co., J. C. Bradford & Co., Inc., and Life Stock in the United States District Court for the Southern District of New York.[7] The complaint alleged violations by the defendants of section 10(b) of the Securities Exchange Act of 1934, as amended,[8] and rule 10b–5 of the SEC.[9]

---

[6]The purchases were made from the inventory of J. C. Bradford & Co.

[7]*Securities and Exchange Commission v. James Cowdon Bradford, et al.*, No. 72 Civ. 4776 (S.D. N.Y. 1972).

[8]15 U.S.C. sec. 78–j(b) (1976), which provides in part: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[9]17 C.F.R. sec. 240.10b–5 (1977), which provides in part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails * * *

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in

The SEC alleged in the complaint that Bradford, Sr., Bradford, Jr., and Life Stock utilized insider information in the acquisition of certain stock of Old Line. The SEC requested a preliminary injunction and a permanent injunction against the defendants from participating in such violations and requested that the Court issue an order directing the defendants to disgorge all profits obtained as a result of their purchases.

Following the filing of the complaint by the SEC, Bradford, Sr., Bradford, Jr., and Life Stock on November 24, 1972, entered into an escrow agreement whereby they deposited a total of $107,200 with the Third National Bank of Nashville. Bradford, Sr., deposited $27,850 in the escrow account, which represented the difference between the value of Old Line stock as of June 29, 1972, and the prices that he paid for the 2,000 shares he purchased for his wife on April 21, 1972. Bradford, Jr., deposited $13,475 in the escrow account, which represented the difference between the value of Old Line stock as of June 29, 1972, and the price he paid for the 1,225 shares he purchased for his own account on April 27, 1972. These funds were to be distributed to any claimants found to be entitled thereto under the action filed by the SEC.

The SEC action was terminated by the filing of a stipulation of settlement on December 5, 1972, and the entry of a consent order on June 1, 1973. As part of the consent order, the escrow agent was required to pay all claims that fell within the following categories:

1. Any person other than a customer of J. C. Bradford & Co. who sold any shares of Old Line to J. C. Bradford & Co. during the period between April 21 to April 27, 1972, and
2. Any customer of J. C. Bradford & Co. who sold any shares of Old Line to J. C. Bradford & Co. during the period between April 21 to June 29, 1972.

---

order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud. or deceit upon any person, in connection with the purchase or sale of any security.

On September 6, 1973, the escrow agent paid a total of $127,567.94 in satisfaction of claims filed against the escrow account. The deficit between the amount paid in satisfaction of the claims and the amount originally deposited in the escrow account was voluntarily paid by J. C. Bradford & Co. on September 5, 1973.

The consent order also permanently enjoined the defendants from violating section 10(b) and rule 10b–5 in connection with the purchase or sale of securities issued or to be issued by Old Line.

By the earlier stipulation of settlement, J. C. Bradford & Co. and J. C. Bradford & Co., Inc., consented to the entry by the SEC of orders censuring them; Bradford, Sr., and Bradford, Jr., consented to the entry of orders suspending them for periods of 60 and 20 days, respectively, from being associated with a broker, dealer, or investment adviser. Additionally, the SEC agreed to enter an order temporarily exempting Life Stock, Bradford, Sr., and Bradford, Jr., from the provisions of section 9(a) of the Investment Company Act of 1940[10] pending final determination of their application for permanent exemption. The temporary exemption was, however, conditioned upon Life Stock's serving without compensation as investment adviser to Life Insurance Investors, Inc., for a period of 45 days following issuance of the temporary exemption.

The defendants to the SEC action agreed to the settlement in order to avoid lengthy and expensive litigation which would have subjected J. C. Bradford & Co. to unfavorable publicity. They also felt that the escrow payments to J. C. Bradford & Co.'s customers would create goodwill for the firm. Additionally, they

---

[10]Sec. 9(a) of the Investment Company Act of 1940 (15 U.S.C. sec. 80a–9 (1976)) provides in pertinent part:

It shall be unlawful for any of the following persons to serve or act in the capacity of employee, officer, director, member of an advisory board, investment adviser, or depositor of any registered investment company, or principal underwriter for any registered open-end company, registered unit investment trust, or registered face-amount certificate company;

\*       \*       \*       \*       \*       \*       \*

(2) any person who, by reason of any misconduct, is permanently or temporarily enjoined by order, judgment, or decree of any court of competent jurisdiction from acting as an underwriter, broker, dealer, or investment adviser, or as an affiliated person, salesman, or employee of any investment company, bank, or insurance company, or from engaging in or continuing any conduct or practice in connection with any such activity or in connection with the purchase or sale of any security; or

(3) a company any affiliated person of which is ineligible, by reason of paragraph (1) or (2), to serve or act in the foregoing capacities.

felt that settlement would head off any civil actions for damages against them. Finally, the settlement allowed Life Stock to obtain a temporary exemption from section 9 of the Investment Company Act of 1940.

On December 20, 1972, Bradford, Sr., created eight trusts for the benefit of his children and grandchildren.[11] On the same day, Bradford, Sr., transferred to those trusts a total of 34,200 shares of stock in Old Line. Bradford, Sr.'s basis in the transferred stock was $282,976, and on the date of the transfer the shares had a fair market value of $2,043,450.

Each of the trusts was created upon the express condition that the trustee pay the Federal and State gift tax liability arising as a result of the gift to the trust.

On February 14, 1973, the trustee paid Federal gift tax in the amount of $397,406[12] and State gift tax in the amount of $135,546 on the transfers of stock.

On their 1973 income tax returns, Bradford, Sr., and Bradford, Jr., deducted $27,850 and $17,685,[13] respectively, as business expenses. These amounts represented their contributions to the funds held under the escrow agreement. In addition, Bradford, Sr., did not report any gain either in 1972 or 1973 upon the transfer of stock in trust for the benefit of his children and grandchildren. Respondent in his statutory notices determined that the transfers of stock constituted taxable exchanges resulting in recognition of the gain in 1972 or alternatively in 1973. Respondent also disallowed the claimed business expenses in their entireties.

OPINION

The first issue for decision is whether payments made in settlement of an SEC action brought under rule 10b–5 alleging insider trading with respect to petitioners' personal accounts constitute ordinary and necessary business expenses or capital expenditures.

Petitioners contend that, although (having inside information) they purchased stock in Old Line for their personal accounts,

---

[11]The Third National Bank of Nashville, Tenn., was named trustee of each trust.

[12]James C. Bradford, Sr., and Eleanor Bradford agreed to split the gifts of stock to the trusts for Federal gift tax purposes.

[13]Bradford, Jr., conceded that he inadvertently overstated his contribution to the escrow fund and that the correct amount is $13,475.

their payments made in settlement of the SEC action constituted ordinary and necessary expenses incurred to protect the business of J. C. Bradford & Co. and their interests as partners in the firm. In support of their contention petitioners assert that their primary purpose in making the payments was to avoid lengthy and expensive litigation and to create goodwill with the customers of J. C. Bradford & Co. Respondent, on the other hand, asserts that petitioners' motives for making the payments are irrelevant to the determination of their deductibility. He argues that, in determining their deductibility, it is necessary to look to the origin of the claim which formed the basis of the SEC action and that the origin of the claim was petitioners' allegedly fraudulent concealment of their inside information while making purchases of stock for their personal accounts. We agree with respondent.

Generally, payments in settlement of a suit arising from allegedly fraudulent activities are deductible as ordinary and necessary business expenses where the activities giving rise to the suit were ordinary business activities. See *James E. Caldwell & Co. v. Commissioner*, 234 F.2d 660 (6th Cir. 1956), revg. 24 T.C. 597 (1955); *Helvering v. Hampton*, 79 F.2d 358 (9th Cir. 1935). However, payments made in settlement of litigation arising from the acquisition of a capital asset constitute capital expenditures. *Redwood Empire S. & L. Association v. Commissioner*, 68 T.C. 960 (1977). Thus, in determining whether petitioners' payments constitute ordinary and necessary business expenditures or capital expenditures, it is necessary to determine whether the litigation arose from allegedly fraudulent activities in the ordinary course of petitioners' business or from the acquisition of a capital asset.

This determination, whether settlement payments are ordinary and necessary or capital expenses, is made by application of the "origin-of-the-claim" test. This test was first enunciated in *Gilmore v. United States*, 372 U.S. 39 (1963), where the Supreme Court was asked to determine whether litigation expenses incurred in a divorce proceeding were expenses for conservation of income producing property or personal expenses. Later, in *Woodward v. Commissioner*, 397 U.S. 572 (1970), the Supreme Court applied the test in determining whether legal expenses incurred in a stock appraisal proceeding were capital expenses or expenses incurred for management, conservation, or mainte-

nance of income producing property. Still later, in *Anchor Coupling v. United States*, 427 F.2d 429 (1970), the Court of Appeals for the Seventh Circuit applied the test in determining whether settlement payments incurred in a suit for specific performance of a sales contract constituted capital or business expenses.

In *Anchor Coupling* the court rejected that taxpayer's argument that the primary purpose test rather than the origin-of-the-claim test should be applied in determining whether settlement payments constitute business expenses or capital expenditures. In so doing the court noted:

> Taxpayer seeks to avoid these conclusions by arguing that here, as in contrast to *Gilmore* and *Woodward*, considerations of motive and the consequences on his business operations are necessary to determine whether the payment is made to protect or defend business property of the taxpayer. We see no such distinction. Admittedly, a settlement payment may have significant effect on current business operations, but as much could also be said for the legal expenses in *Gilmore*, or for that matter, the purchase of many capital assets. Accordingly, we hold that the origin and character of the claim with respect to which a settlement is made, rather than its potential consequences on the business operations of a taxpayer is the controlling test of whether a settlement payment constitutes a deductible expense or a nondeductible capital outlay.

In *Locke v. Commissioner*, 65 T.C. 1004 (1976), affd. 568 F.2d 663 (9th Cir. 1978), we applied the origin-of-the-claim test in determining whether legal expenses incurred in the defense of a private action for damages brought under SEC rule 10b–5 constituted ordinary and necessary business expenses or capital expenditures. In *Locke*, the taxpayer allegedly had "inside" information when he purchased stock. Subsequently the seller brought an unsuccessful private action against the taxpayer for fraud under rule 10b–5 seeking disgorgement of profits. We found the claim to have originated in the taxpayer's purchase of stock rather than the taxpayer's position as an "insider." As a consequence, we held that the legal expenditures incurred in defending the purchase were capital expenditures.

Petitioners, nonetheless, assert that the origin-of-the-claim test is inapplicable to the instant case and that the primary-purpose test should be used in determining whether the payments constitute ordinary and necessary business expenses or capital expenditures. They further argue that their primary purpose for making the payments was to protect their business.

They base their contention on the fact that *Locke* and the other cases in which the origin-of-the-claim test has been applied are factually distinguishable. Petitioners first point to the fact that *Locke* involved an action brought against the taxpayer by the seller, while here the action was initiated by the SEC. Second, in *Locke* the test was applied to the buyer, while here Mrs. Bradford, a buyer of a portion of the stock, was not a party to the action and made no payments. Third, the action in *Locke* was for damages to the sellers, while here the monetary settlement was a sanction imposed by a Federal agency. Finally, petitioners assert that *Locke* involved payments made to protect the title or ownership of stock while their payments were made to protect their business.

We are convinced that these so-called distinctions between the facts herein and those in other cases applying the origin-of-the-claim test are irrelevant. The same considerations which prompted the Court of Appeals for the Seventh Circuit to apply the origin-of-the-claim test in *Anchor Coupling* in determining whether a settlement payment constitutes a business expense or a capital expenditure are present here. In *Anchor Coupling* the court stressed the following three factors:

> For the deductibility of payments to depend upon such elusive determinations [the taxpayer's motive] causes tremendous difficulties for the administration of the tax laws. Further, for deductibility to depend upon subjective considerations encourages schemes of tax avoidance and, as the Supreme Court noted in *Gilmore*, can lead to capricious results and a concomitant lack of uniformity in the application of our tax laws. Finally, as the Court noted in *Woodward*, a test based upon taxpayer's purpose in defending or settling litigation would encourage resort to "formalisms and artificial distinctions."

Each of these considerations is equally present herein and impels us to apply the origin-of-the-claim test.

Moreover, none of the so-called factual distinctions relied upon by petitioners compel a contrary result. First, the fact that the action was brought by the SEC and not the sellers is irrelevant. The SEC acted on behalf of the allegedly defrauded sellers, for whose benefit the payments were made. Second, petitioners' reliance on the fact that Mrs. Bradford, Sr., was not a party to the SEC action is also misplaced. The gravamen of the alleged offense was fraud in the purchase of stock; the deflection to Mrs. Bradford, Sr., of the fraudulent purchase and therefore of the allegedly ill-gotten gains does not alter the fact that the

transaction (her purchase) was no part of Bradford, Sr.'s business but an investment transaction. Bradford, Sr., did not do it for a broker's commission.

Petitioners' further argument that the payments in question were sanctions imposed by a Government agency and not damages paid to the sellers is fruitless. The mere labeling of the payments as penalties or damages cannot detract from the fact that the payments represented alleged illegal profits which were repaid to the allegedly defrauded sellers. Regardless of the nomenclature used to describe the payments, they represent disgorged profits from a failed investment transaction. More fundamentally, the "origin-of-the-claim" test focuses on the transaction giving rise to the claim. The transaction was just as much an investment transaction regardless of the precise nature of the damages arising from it.

As for petitioners' argument that the "origin-of-the-claim" test is inapplicable herein since the SEC action did not involve the acquisition or protection of the title of a capital asset, this argument merely begs the question the test was designed to resolve, namely, whether the claim which gave rise to the litigation originates in the acquisition or protection of a capital asset.

In light of the foregoing we reject petitioners' contention that the primary-purpose test applies in determining the character of petitioners' settlement payments. We thus turn to an examination of the facts surrounding the payments to determine the origin of the claim to which they relate. In our inquiry, we are cognizant of the fact that—

the "origin-of-the-claim" rule does not contemplate a mechanical search for the first in the chain of events which led to the litigation but, rather, requires an examination of all the facts. The inquiry is directed to the ascertainment of the "kind of transaction" out of which the litigation arose. Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the controversy. [*Boagni v. Commissioner*, 59 T.C. 708, 713 (1973); citations omitted.]

Petitioners assert that the claim or controversy giving rise to the settlement involved more than the purchase of stock. They assert that their nondisclosure of the information concerning the proposed merger was the essence of the SEC action; they argue that the nondisclosure related to their status as broker-dealers

and as a consequence that the settlement also related to their business. We disagree. The SEC sought not only to impose sanctions against petitioners as broker-dealers but also to require them to disgorge the profits arising out of their inside trading activities for their personal accounts. It was not necessary for them to be broker-dealers to fall afoul of rule 10b–5. In essence the SEC action sought injunctive relief against petitioners because of their actions as "tippers" and damages because of their actions as "tippees." The settlement payments went only to the latter portion of the SEC action. Those payments were received by individuals who sold Old Line stock to J. C. Bradford & Co., which stock in effect was used to replace the Old Line Stock petitioners purchased from J. C. Bradford & Co.'s inventory. In addition, the amount paid by each petitioner was based solely upon the alleged illegal gains realized on the purchases. We therefore conclude that the monetary portion of the SEC action and settlement arose in connection with petitioners' purchase of stock of Old Line. As a consequence the amounts must be added to the basis of the stock purchased.

The final issue for decision is whether James C. Bradford, Sr., realized income by reason of his gift of stocks to a trust where the transfer was conditioned upon the trustee's promise to pay the resulting Federal and State gift taxes. Subsequent to the date this case was tried and after the parties filed their briefs, *Estate of Henry v. Commissioner*, 69 T.C. 665 (1978), on appeal (6th Cir., May 5, 1978), was decided by this Court. Inasmuch as the facts and legal question presented herein are indistinguishable from those of *Estate of Henry*, we hold that James C. Bradford, Sr., did not realize income as a result of his gifts of stock conditioned upon the donee's payment of the resulting Federal and State gift taxes.

*Decisions will be entered under Rule 155.*