KELLER STREET DEVELOPMENT COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent PAUL KALMANOVITZ AND LYDIA KALMANOVITZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Keller Street Development Co. v. Commissioner
Docket Nos. 8666-72, 8890-72.
United States Tax Court
T.C. Memo 1978-350; 1978 Tax Ct. Memo LEXIS 165; 37 T.C.M. (CCH) 1451; T.C.M. (RIA) 78350; September 5, 1978, Filed *165 Keller Street Development Company sought to treat a payment received in settlement of a shareholder's derivative lawsuit as gain from the sale of a capital asset. Held, such amount was paid as reasonable compensation for the use of Keller's transferred assets for almost a decade and as a substitute for such product or profit derived thereby, and is fully includable in Keller's gross income pursuant to sec. 61. Held, further, reasonable compensation for Keller's sole executive officer set at $ 55,000 per year. Held,further, useful life of shopping center properties determined. Jerry H. Robinson and Robert C. Alexander, for the petitioners. Eugene H. Ciranni, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: In these consolidated cases, respondent has determined the following deficiencies in petitioner's Federal income tax: Taxable Dkt. No.
Petitioner
Year
Deficiency
8666-72
Keller Street De-
1964
$ 203,026.19
velopment Company
1965
98,153.66
1966
69,410.50
1968
2,499,336.20
8890-72
Paul Kalmanovitz and
1965
14,293.15
Lydia Kalmanovitz
1968
51,892.00
1969
82,623.52
Concessions having been made, the issues presented *167 for our decision are as follows: (1) Whether an amount received by Keller Street Development Company in settlement of a shareholder's derivative lawsuit constitutes gain from the sale of a capital asset; (2) Whether the salary paid by Keller Street Development Company to its president and majority stockholder, Paul Kalmanovitz, was reasonable to the extent that it exceeded $ 15,000 for each of the years 1966, 1967, and 1968, and for purposes of the compensation deduction allowed under section 162(a)(1); [1] and (3) Whether Paul Kalmanovitz, as owner of a certain shopping center, used a proper useful life in claiming depreciation deductions. FINDINGS OF FACT Some of the facts have been stipulated and are so found. *168 Keller Street Development Company (petitioner in docket No. 8666-72) is a corporation organized under the laws of California. At the time the petition herein was filed, petitioner's principal office and place of business was at San Francisco, California. Petitioner filed its Federal income tax returns for the calendar years in issue with the Internal Revenue Service Center, Los Angeles, California. Paul and Lydia Kalmanovitz (petitioners in docket No. 8890-72) are husband and wife and resided in Tiburon, California, at the time their petition herein was filed. Petitioners filed their joint Federal income tax returns for the years in issue with the Internal Revenue Service Center, Los Angeles, California. Keller Street Development Company (Keller Street, or Keller, or petitioner, where the identity is clear) is a successor corporation to the Maier Brewing Company (Maier Brewing). The latter company emerged from bankruptcy in the midforties and continued in the brewery business until it sold its assets to the S & P Company on October 17, 1958. The S & P Company then changed its name to Maier Brewing and the former Maier Brewing became Keller Street. During the taxable *169 years at issue Paul Kalmanovitz (petitioner) and his spouse owned, or controlled through a charitable foundation and a wholly owned corporation, approximately 70 percent of Keller Street's outstanding stock. The remaining 30-percent minority interest was owned by 69 different parties all unrelated to petitioner. In addition, petitioner has served as the chief executive officer of Keller Street since 1950. Keller Street was experiencing serious financial difficulties when petitioner became its president. Petitioner discovered that lines of credit were canceled and that sources of working capital were depleted. Attempts to obtain federally-assisted loans proved fruitless. Moreover, as the financial problems escalated, the only financing available to Keller Street was through loans guaranteed by petitioner. In addition to these short-run financial difficulties, Keller Street faced long-range financial planning problems. For example, approximately $ 2,000,000 was needed for the construction of a new bottle house to replace the one condemned by state authorities; substantial maintenance expenditures were required to renovate and maintain existing plant equipment that had been *170 neglected in previous years; and additional marketing expenditures were needed to stem the invasion of new breweries into Keller Street's market. The book value of Keller Street's common stock in 1950 was approximately $ 4.50 per share. At no time during the period 1950 through 1968 were any dividends declared or paid by Keller Street to its shareholders. Because of this lack of dividend yield, the minority shareholders expressed a desire to sell the brewery and obtain a return of their capital investment. After publicity of the impending sale had been circulated among Keller Street's customers by the minority shareholders, the board of directors passed a resolution that petitioner was authorized to negotiate the sale of the company's assets with anyone "on the most favorable price and terms attainable." On June 28, 1958, Maier Brewing, then known as the S & P Company (a corporation wholly owned by petitioner and his spouse), submitted a written offer to purchase the brewery business of Keller Street, then known as the Maier Brewing Company (a corporation approximately 70-percent owned by petitioner and his spouse). The offered purchase price was $ 7,708,605.25, which included *171 $ 6,000,000 for the brewery assets, other than inventory and accounts receivable, and $ 1,708,605.25, for the book value of the inventory and the face value of the accounts receivable (reduced by a five-percent reserve). The letter setting forth the offer stated the following terms for payment of the purchase price: (a) The sum of $ 100,000 shall be paid by S & P Company [Maier Brewing] to Maier [Keller Street], upon acceptance of this offer. (b) The sum of $ 200,000 shall be paid by S & P Company [Maier Brewing] to Maier [Keller Street] at such time as the brewer's licenses issued by the State and Federal Governments are transferred to S & P Company [Maier Brewing]. (c) The balance shall be payable at the rate of $ 300,000.00 annually, the first of such payments to be made one year from the date of acceptance of this offer and other payments on successive anniversaries of that date, the entire unpaid balance on principal and interest to be due and payable 10 years from the date of acceptance of this offer. The unpaid balance shall not bear interest for the first five years after date of acceptance of this offer but thereafter the unpaid principal balance shall *172 bear interest for each year until paid, at the interest rate in effect at the commencement of each year for prime bank loans in the City of Los Angeles, California. The annual payments of $ 300,000.00 during the second five years shall be inclusive of interest and principal and shall be applied first to interest then due and the balance to principal. This offer was approved by the board of directors and accepted by a majority of the shareholders on June 28, 1958. The terms of the purchase and sale of the assets, other than the inventory and accounts receivable, were embodied in a conditional sales contract dated October 15, 1958, under which the $ 6,000,000 purchase price was payable as follows: $ 91,394.75 on June 29, 1963 and $ 300,000.00 or more on each June 29 thereafter, including interest at the rate in effect at the commencement of each year for prime bank loans in the City of Los Angeles. The entire amount to be due and payable on October 15, 1968. On October 15, 1958, Maier Brewing delivered to Keller Street $ 300,000 in cash and its interest-free promissory note in the faceamount of $ 1,408,605.25 evidencing the obligation to pay the purchase price for the inventory *173 and accounts receivable. Under the terms of this note $ 300,000 was payable on June 29, 1959, 1960, 1961, and 1962, and $ 208,605.25 was payable on June 29, 1963. Possession and title to the brewery assets were transferred by Keller Street to Maier Brewing pursuant to the purchase and sale contract on October 17, 1958. On June 29, 1958, the day following adoption of the resolution to sell the brewery's assets, a group of minority shareholders consulted legal counsel for information about their available legal remedies with respect to the asset sale. The evidence from the whole record indicates that the principal objection of the shareholders was to the terms for payments under the sale, i.e., that all cash payments were made to Keller Street. [2] This precluded the payment of any portion of the sale price to the minority shareholders. The dissident shareholders were willing to pursue whatever legal remedy was necessary to recover their cash investment from the proceeds of the asset sale. It was the opinion of counsel that the only means of obtaining relief for the minority shareholders was through an action based upon rescission. Under this theory a suit was commenced in *174 the California Superior Court for the County of Los Angeles on July 29, 1958. Named as defendants in the action were the petitioners Paul Kalmanovitz and Keller Street, as well as the purchaser of the assets, Maier Brewing, and the directors of Maier Brewing. In essence, the complaint asserted that the transaction involving the purchase and sale of the brewery assets was not just and reasoanble as to Keller Street and was fraudulent for several alleged reasons. The complaint cited the following reasons: (a) There is no reason for making the sale except to permit Kalmanovitz, through said S & P [Maier Brewing], to acquire the business and assets of Maier [Keller Street] for his own benefit and profit and to freeze out the minority shareholders; that his resigning as a director on June 29, 1958, was only for the purpose of making it appear that he was not on the board of directors of Maier [Keller Street], although he controlled the appointment of the directors and such directors had theretofore agreed to vote *175 as he directed. (b) That no appraisal had ever been made to ascertain the true worth of the business, the subject of the proposal, and if an appraisal was in fact made, the information thereof was not disclosed to the shareholders. (c) There was no effort to ascertain whether or not an offer could be obtained for a better price, and if not a better price, then under better terms and conditions. (d) That the financial responsibility of S & P [Maier Brewing] is unknown to plaintiffs, though well known to defendants, other than Maier [Keller Street]; that said S & P [Maier Brewing] refuses to make available to credit reporting concerns, such as Dun & Bradstreet, information of its financial condition, of the number of shares issued and outstanding, of its banking connection, or any other details. (e) That there is no assurance that the purchase price ultimately will be paid. (f) That the plan calls for annual principal payments of $ 300,000 for a period of five years, during which there will be no interest on the unpaid balance, whereas, if the current interest rate of not less than 5% per annum were charged, such interest would amount to at least $ 400,000 annually. *176 (g) That Maier's [Keller Street's] business is operating most profitably, and for the period of January 1, 1958 to May 31, 1958, the net profits, before income taxes, amounted to at least $ 300,000; that the exact profit cannot be ascertained from the books and records of Maier [Keller Street]. The remedies sought by the plaintiffs were (1) to vacate and set aside the agreement for the purchase and sale of the brewery assets; (2) to enjoin any transfer of assets from Keller Street; (3) to establish a constructive trust as to any assets already transferred by Keller Street; (4) to account for the benefits, profits and advantages acquired by the defendants; (5) to pay plaintiff's legal costs, and (6) to obtain such other relief as to this Court may deem proper in the premises. After the filing of answers by the defendants, a trial was held resulting in a judgment for the defendants. The superior court found, inter alia, that the terms of payment for the brewery assets "were fair in all respects" to Keller Street and to its shareholders. As a matter of law the court concluded that the agreement for the sale of the brewery assets was "in all respects fair, proper and *177 lawful as to all parties." The plaintiffs appealed to the California Court of Appeals, which, on April 21, 1964, reversed the decision of the superior court. The court of appeals held the burden of proof was on Paul Kalmanovitz, as the dominant shareholder of Keller Street, to prove that the transaction was inherently fair from the viewpoint of the corporation and its shareholders and that, in the absence of additional evidence, his conduct ocnstituted "constructive fraud." The court observed that the plaintiffs had conceded that the total purchase price was adequate but that "a difficult problem is presented by the contention that the evidence did not support the determination of the trial court that the terms of payment were fair to the selling corporation." After a second trial on remand, the superior court concluded that the terms of payment under the purchase and sale agreement were not just and reasonable and were unfair to Keller Street. By its findings and judgment the trial court in effect divided the assets held by Maier Brewing into four categories: (a) Assets owned by Maier Brewing prior to the acquisition of the brewery assets from Keller Street; (b) Real property *178 which Keller Street agreed to sell to Maier Brewing as part of the sale of the brewery assets; (c) Certain real property acquired by Maier Brewing after the transaction with Keller Street; (d) All other property, tangible and intangible, of every nature whatsoever and wheresoever situated owned or held by Maier Brewing. The court decreed that the last three categories of assets were held by Maier Brewing as a constructive trustee for Keller Street. The defendants appealed this decision and on March 6, 1967, the California Court of Appeals once again reversed the decision of the superior court. The court of appeals held that a constructive trust was improper unless the assets in category (c), supra, and that portion of the assets in category (d), supra, acquired by Maier Brewing subsequent to the purchase and sale from Keller Street, could be traced to the income generated by the assets purchased from Keller Street. In addition, the appellate court held that if any of the assets impressed with the constructive trust by the superior court could not be traced to the income generated by the assets acquired from Keller Street, a money judgment would be the only remedy *179 available to the plaintiffs. The case was once again remanded to the superior court with express directions to make findings as to: (1) The earnings or profits derived by Maier Brewing from the assets it acquired from Keller Street; (2) What properties were acquired by Maier Brewing through the use of the earnings and profits derived from the brewery assets; (3) The amount that Maier Brewing is entitled to reimbursement or credit; and (4) The reasonable compensation to which the attorneys for the plaintiffs are entitled. The final trial held in the superior court was essentially an accounting proceeding in which the parties attempted to trace the profits earned by Maier Brewing to the brewery assets it acquired from Keller Street. Such a tracing was virtually impossible since Maier Brewing engaged in numerous business ventures distinct from its brewery operations and commingled all the funds derived from such activities. After tracing proved futile the court suggested to the parties that they seek an agreement among themselves on the basis of settling the entire litigation. The settlement negotiations dealt with the price to be paid the minority shareholders for their *180 shares and the amount of attorney fees to be paid. After several days of extensive negotiations the parties finally reached an agreement. The plaintiffs agreed to terminate the litigation and defendants agreed to purchase the minority shares at $ 55 per share in addition to the payment of $ 500,000 in attorney fees. Subsequent to the settlement, the superior court issued, on June 3, 1968, its findings of fact and conclusions of law which incorporated the terms of the settlement. Among the findings made by the superior court were the following: (a) That the terms of payment under the agreement of purchase and sale of June 29, 1958, between Maier Brewing and Keller Street were not just and reasonable and that they "were unfair to Keller solely in the sense that such terms of payment were, under all circumstances, unfair." (b) That "there is no evidence to support any intention to defraud Keller or its minority shareholders." (c) That the earnings and profits generated by Maier Brewing from the use of the brewery assets acquired from Keller Street could not be established or traced into specific assets acquired by Maier Brewing after the acquisition of the assets from Keller *181 Street. (d) That in lieu of specific profits from the brewery assets, Keller Street was entitled to a reasonable amount computed by using "solely as a measure of said product or profit" interest on the fair market value of the transferred assets as of June 29, 1958. (e) That the fair market value on June 29, 1958, of all of the brewery assets transferred to Maier Brewing, other than the inventory and accounts receivable, was $ 4,000,000. (f) That the fair market value on June 29, 1958, of the inventory and accounts receivable transferred to Maier Brewing was $ 1,761,193.49. (g) That the "most logical and feasible method of accomplishing the rescission -- ordered by the Court of Appeal (249 C.A. 2d 187)" is to obligate Maier Brewing to pay certain sums to Keller Street and to give certain credits to Maier Brewing. (h) That "the minority shareholders of Keller should be given an opportunity to sell their shares -- in Keller [Street] -- to either Mr. Paul, [Kalmanovitz] Keller or Maier (S & P) at a price of Fifty-five Dollars per share and the court finds that it is fair and in good faith that Mr. Paul [Kalmanovitz] (or Keller or Maier (S & P)) -- having *182 agreed and stipulated to purchase any of said shares offered at that price -- must purchase shares in Keller owned by plaintiffs (who must sell their shares) and will purchase shares in Keller owned by others -- and offered for sale to Mr. Paul [Kalmanovitz] (or Keller or Maier (S & P)) prior to September 3, 1968…" (i) That Keller Street pay $ 500,000 as fees for the plaintiffs' attorneys. The relevant conclusions of law stated by the trial court were the following: (a) "That because of complete commingling of transferred brewery assets -- pursuant to said June 29, 1958 contract -- with assets owned by [Maier Brewing] as of said date and with other assets acquired by [Maier Brewing] -- subsequent to June 29, 1958 -- from sources other than from the transferred brewery assets, it is impossible to determine the product or profit realized by [Maier Brewing]… from the use of said transferred brewery assets or to trace any such product or profit into any specific asset or fund -- which was acquired by [Maier Brewing] subsequent to June 29, 1958." (b) "That in lieu of such product or profit (or of some asset or fund acquired or created with or by such product or profit) *183 the court allows [Keller Street] the sum of $ 2,432,175.45 as reasonable compensation -- to [Keller Street] for the use by [Maier Brewing], of such transferred brewery assets during the period subsequent to June 29, 1958 and as a substitute for such product or profit." (c) That the plaintiffs must sell and Keller Street must buy all of the plaintiffs' shares of Keller Street, and any shares of other minority shareholders tendered for that purpose, for $ 55 per share. * * * Under that judgment the 1958 purchase and sale was rescinded and in lieu of the monetary rights and obligations under the original purchase and sale agreement, Maier Brewing was ordered to pay an aggregate amount of $ 10,858,368.94, comprised of the following: [3]
Brewery assets (including
the original assets sold
plus the bottle house built
subsequent to the 1958
transaction)
$ 6,300,000.00
Additional sum as a sub-
stitute for product or
profit
2,432,175.45
Rent on bottle house
365,000.00
Accounts Receivable and
Inventory
1,761,193.49
*184 On May 8, 1970, the superior court issued a nunc pro tunc order to correct its June 3, 1968, judgment. The effect of the nunc pro tunc order was to reduce the credits to which Maier Brewing was entitled, to describe the bottle house property, and to provide for the purchase by Maier Brewing of certain assets that had been acquired by Keller Street during the course of the litigation and were necessary for operation of the brewery. The court also ordered that Keller Street prepare and file with the court a list of its shareholders and notify each shareholder of the terms of the settlement by which Keller Street would purchase the shares of its minority shareholders. Pursuant to the judgment of the superior court and subsequent nunc pro tunc order, Keller Street purchased 25,672 shares from minority shareholders for a purchase price of $ 55 per share. As of October 1, 1976, approximately 4.34 percent of Keller Street's outstanding shares were still owned by certain minority shareholders and the remaining 95.66 percent of the shares were owned by S & P Company (petitioner's wholly owned corporation). As a consequence of ten years of arduous litigation Maier Brewing's possession *185 of the brewery assets acquired from Keller Street in June 1958, including the assets subsequently acquired in connection with its brewery operations, remained undisturbed. All amounts paid by Maier Brewing to Keller Street as a result of the litigation were capitalized by Maier Brewing and treated as an adjustment to the original selling price. Keller Street likewise treated the receipt of such amounts as long-term capital gain under the installment method as reported on its 1968 U.S. Corporation Income Tax Return, Schedule D. Throughout the litigation petitioner remained Keller Street's chief executive officer and has been its sole employee since 1959. To the position of chief executive officer petitioner brought many years of varied experience demonstrated by his involvement in the real estate and alcoholic beverage businesses since 1939 and in the brewery business since 1950. Both parties to this litigation seem to agree that, despite financial problems, petitioner made a success of the brewery causing it to become the largest seller of beer in California. As the testimony indicated, however, this success was short-lived. The economic conditions in the California beer *186 market prior to the sale of the brewery's assets were unsettled.In the early fifties the major eastern breweries invaded Maier Brewing's market crippling the brewery's distribution network. In response to this, petitioner developed a new corporate strategy by switching from beer production under the company label of Maier Brewing to beer production under the private labels of other concerns. The measure of economic success directly attributable to this strategy is evident from the unrebutted testimony that approximately 95 percent of Maier Brewing's production was in the private label market during the late fifties. Subsequent to the sale of the brewery assets and during the years at issue petitioner performed all the administrative and managerial functions associated with the business operations of Keller Street. The nature and extent of petitioner's position with Keller Street entailed numerous responsibilities. He performed the corporate accounting function and made all major corporate decisions. During the pendency of the shareholder derivative action petitioner routinely employed legal counsel to represent Keller Street. In addition, he concerned himself with real estate *187 purchases and business acquisitions for Keller Street. Petitioner was the sole owner, with his spouse, and chief executive officer of Maier Brewing Company (formerly the S & P Company) during the years at issue and contemporaneously with his position at Keller Street. Apparently petitioner was capable of managing both Keller Street and Maier Brewing because of his rather extraordinary work habits. Petitioner testified that he had no interests other than work. During the years at issue, petitioner maintained two offices, one at 500 East Commercial Street, Los Angeles, and one at his home in Newport, California. In a typical work day he would arrive at his Commercial Street office at 7:45 a.m. and work there until 3 p.m. or until 6:30 p.m., depending on traffic conditions. He would then go home and work until bedtime, rising again after about seven hours and then proceed to his Commercial Street office. The record indicates that petitioner's primary loyalty was to Keller Street but it is unclear from the record what specific amount of time petitioner actually devoted to Keller Street vis-a-vis Maier Brewing. A "major" portion of petitioner's time and energy during the years *188 at issue was, admittedly, devoted to resolution of the shareholder's derivative suit against Keller Street. Yet, because of petitioner's dual role as chief executive officer of both Keller Street and Maier Brewing (the co-defendant in the suit), it is fair to assume that some portion of his time was devoted solely to the corporate affairs of Maier Brewing. Compensation received by petitioner for services rendered Maier Brewing amounted to $ 60,000 per year, except in 1966 and 1968 when petitioner was paid $ 90,000 per year.Petitioner received the following annual salary compensation for his services on behalf of Keller Street which bore no direct relationship to its annual earnings: 1951
$ 60,000
1952
60,000
1953
60,000
1954
60,000
1955
80,000
1956
60,000
1957
60,000
1/1--6/30/58
30,000 (six months)
7/1--12/31/58
None
1959
None
1960
None
1961
None
1962
None
1963
None
1964
None
1965
None
1966
90,000
1967
90,000
1968
90,000
1969
50,000
1/1--6/30/70
25,000 (six months)
FYE 6/30/71
50,000
FYE 6/30/72
50,000
FYE 6/30/73
50,000
Average annual salary paid petitioner for the period June 1958 through December 1968, amounted *189 to $ 25,174. The ratio of compensation paid to gross income for the years 1966, 1967, and 1968, is 8.39, 13.94, and 5.14 percent, respectively. Petitioner received no expense allowance, insurance benefits, fringe benefits, or perquisites of any kind from Keller Street during the years 1966, 1967, and 1968. The minority shareholders neither expressly approved nor disapproved petitioner's salary for the taxable years at issue. Under petitioner's guidance Keller Street has exhibited an inconsistent growth pattern in the book value of its assets and has reported a fluctuating taxable income (before the net operating loss deduction and special deductions) for the following years of operation: TI before NOL and Book value at TI beforn NOL and Book value at
Year special deduction end of year 1957 $ 3,135,299
1958 $ 219,505 7,710,870
1959 (31,243) 7,631,065
1960 (57,190) 7,789,572
1961 (29,153) 7,723,626
1962 67,482 7,676,617
1963 212,716 7,815,588
1964 217,406 8,937,086
1965 265,956 8,640,490
1966 21,124 8,510,761
1967 (102,286) 7,706,733
1968 (176,078) 7,958,886
1969 40,598 11,890,062
1/1--6/30/70 73,758 11,515,104
FYE 6/30/71 292,846 10,694,777
FYE 6/30/72 146,830 *190 16,777,918
FYE 6/30/73 169,209 15,153,473 After the sale of the brewery assets, Keller Street was still active in various business endeavors notwithstanding the fact that it was no longer in the brewery business. During the years in question, Keller Street had gross income derived from the following sources: Year
Source
Amount
1966
Gross sales of beer [4]
$ 436,028
Interest
287,834
Rent (four properties)
151,344
Installment sale of
brewery assets
12,167
Dividends
100
Miscellaneous income
92
Sale of securities
184,753
1966 Gross Receipts
$ 1,072,318
1967
Gross Sales of beer [4]
$ 181,882
Interest
257,271
Rent (four properties)
157,001
Installment sale of
brewery assets
42,952
Dividends
100
Miscellaneous income
6,391
1967 Gross Receipts
$ 645,597
1968
Interest
$ 147,218
Rents (four properties)
453,922
Miscellaneous income
8,686
Installment sale of
brewery assets
193,374
Dividends
19,100
Condemnation proceeds
927,074
1968 Gross Receipts
$ 1,749,374
*191 Petitioner had extensive real estate dealings for investment purposes. He purchased four shopping centers ranging in land area from 5 to 25 acres. One of these is the Westminster Shopping Center located at the northwest corner of Westminster Avenue and Goldenwest Street in Westminster, California. Access to the shopping center is provided by two freeways that are approximately one mile from the shopping center. Westminster Avenue, on which the center is located, is a commercial strip. The general neighborhood surrounding the center is middle-income and single-family residential. Two miles southeast of the center is Huntington Center, an enclosed regional mall shopping center that opened in 1967 and contains 859,000 square feet of gross leasable area. One mile to the south of the center is Westminster Mall, another enclosed regional mall shopping center.However, this center is a bilevel "super" enclosed regional mall consisting of approximately 1,200,000 square feet of gross leasable area. Located across from Westminster Shopping Center, on the southwest corner of Westminster Avenue and Goldenwest Street, is a small "town and country" shopping center with a leasable area *192 of only 25,000 square feet. Westminster Shopping Center was constructed in 1958 and was purchased by petitioner on April 1, 1968, for the sum of $ 4,026,526. On the date of purchase it consisted of four independent structures and two shopping malls. The center contained 255,257 square feet of gross leasable space with a total land area of 25.49 acres. The majority of the structures in the center were constructed with concrete block walls and wood roofs supported by steel or wood columns. There were no reinforced concrete structures in the center. At the time of purchase the center was occupied by a diversity of tenants. It had 52 tenants comprised of 43 retail outlets, 2 offices, a savings and loan, a commercial bank, a theatre, a restaurant, a U.S. Post Office branch, a county library, and a community hall. Major "anchor" tenants in the center during 1968 were Food Giant, Builders Emporium, S. H. Kress Co., and Edwards Theatre, occupying 40,062, 34,081, 30,000, and 23,548 square feet, respectively. The loss of such tenants means that shoppers of the center will patronize other shopping centers. The detrimental impact of the enclosed regional shopping centers on Westminster, *193 a community shopping center, is demonstrated by the fact that 19 tenants have vacated the premises since 1974. One of these tenants, the S. H. Kress Co., was a major tenant that vacated the center in 1975.In addition, upon the expiration of a tenant's lease, the tenant usually obtained a renewal lease that encompassed a shorter monthly term. Petitioner intended to demolish and rebuild the shopping center within 18 years from the date of its purchase. At that time any remaining tenants would be either released from their leases or permitted to relocate in the new center. The few tenants that would remain at the end of the 18 years make it economically unfeasible for petitioner to operate the center. Gross rental income of the center was as follows: 1968 (8 months)
$ 320,790.37
1969
546,050.97
1970
555,031.20
1971
545,110.68
1972
571,185.66
1973
536,458.00
1974
564,247.00
1975
559,764.00
On the basis of an economic analysis of the property, petitioner estimated that the useful life of the center was not greater than 28 years from the date of its construction in 1958 or, alternatively, not greater than 18 years from the date of its purchase in *194 1968. Petitioner offered the testimony of a retail feasibility analyst. He conducted a market feasibility and economic life analysis study of the Westminster Shopping Center. The expert testified, based upon this study, that the center had an economic life between 24 and 32 years from the year of its construction in 1958. According to the expert, the study resulted in the conclusion that petitioner's shopping center will become economically and functionally obsolete between 1982 and 1990.
In the notice of deficiency in docket No. 8890-72, respondent determined that the useful life of the Westminster Shopping Center was 35 years from its date of purchase in 1968.Therefore, respondent disallowed the depreciation deduction taken by petitioner in 1968 and 1969 in the respective amounts of $ 106,184 and $ 118,583. In the notice of deficiency in docket No. 8666-72, respondent determined that the amount realized by Keller Street under the June 3, 1968, judgment was recognized as ordinary income fully includable in its gross income pursuant to section 61. Keller Street treated this amount as an adjustment to the selling price of its assets and reported such amount as proceeds from *195 the sale of a capital asset. A further determination by the respondent in that same notice of deficiency is that the compensation paid to petitioner was, in part, unreasonable. Respondent found that an annual salary of $ 15,000 for taxable years 1966, 1967, and 1968, respectively, was reasonable and disallowed the corresponding deduction of $ 75,000 for these respective years as excess compensation paid to petitioner's president and majority stockholder. OPINION Issue 1. Settlement Amount
Respondent contends that Keller Street is not entitled to treat the settlement amount of $ 2,432,175.45 as capital gains because said amount was characterized by the trial court in its final judgment as a substitute for lost profits. Keller's principal argument is that the amount received in settlement of the litigation was merely an adjustment of the original selling price since the litigation arose from the purchase and sale of its assets and, as such, should be taxable as gain from the sale of a capital asset. Assuming, arguendo, that the $ 2,432,175.45 was received in settlement of the litigation, as contended by petitioner, both parties agree that the tax character of said *196 amount is governed by the origin and nature of the claim. This "origin-of-the-claim" test was first enunciated in United States v. Gilmore,372 U.S. 39, 48-49 (1963): [The] characterization, as "business" or "personal," of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defeat the claim * * * * * *
* * * we resolve the conflict among the lower courts * * * in favor of the view that the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test * * * [Emphasis in original and added.] Subsequent to its decision in Gilmore,supra, the Supreme Court decided Woodward v. Commissioner,397 U.S. 572 (1970), and United States v. Hilton Hotels Corp.,397 U.S. 580 (1970). The Court indicated in these cases that the test to be applied in determining whether costs *197 are incurred in the acquisition of a capital asset is a simple "inquiry whether the origin of the claim litigated is in the process of acquisition itself." See Woodward v. Commissioner,supra at 577. The Supreme Court refused to apply the more subjective primary purpose test; that is, any litigation expenses are deemed capital in nature only where the taxpayer's "primary purpose" in incurring them is to defend or perfect title.See Woodward,supra at 577; United States v. Hilton Hotels Corp.,supra at 585. The Court in Woodward, therefore, applied an objective standard based on the origin and character of the litigation in lieu of a subjective standard founded on the motive or purpose in undertaking the litigation. The origin-of-the-claim test focuses on the deductibility of expenses incurred in litigation. It has been applied to determine the tax character of an amount incurred in settlement of a lawsuit. See Entwicklungs & Finanzierungs A.G. v. Commissioner,68 T.C. 749 (1977); Eisler v. Commissioner,59 T.C. 634 (1973). In the instant case, however, the origin-of-the-claim test *198 is used by the parties to characterize the income realized on an amount received in settlement of a lawsuit. This is a permissible application of the test since it deals with the characterization of income as well as expenses. See Gidwitz Family Trust v. Commissioner,61 T.C. 664 (1974). See also State Fish Corp. v. Commissioner,48 T.C. 465 (1967). Several criteria have been set forth by this Court in attempting to identify the origin of the claim. As stated in Boagni v. Commissioner,59 T.C. 708, 713 (1973): Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the controversy. * * * Furthermore, it is the nexus between the origin of the litigation and the basis with which the settlement was reached that is controlling and not petitioner's motives. Newark Morning Ledger Co. v. United States,539 F. 2d 929, 935 (3d Cir. 1976); Anchor Coupling Co. v. United States,427 F. 2d 429, 433 (7th Cir. 1970); Entwicklungs & Finanzierungs A.G. v. Commissioner,68 T.C. 749, 766 (1977); *199 Eisler v. Commissioner,59 T.C. 634, 639 (1973); DuGrenier, Inc. v. Commissioner,58 T.C. 931 938 (1972). Since an appeal from our decision herein will lie in the Ninth Circuit, we note that this is the rule followed by that circuit.See DeMink v. United States,448 F. 2d 867 (9th Cir. 1971); Spangler v. Commissioner,323 F. 2d 913 (9th Cir. 1963). Petitioner has the burden of proving that the settlement amount received in 1968 was solely for the sale of the brewery assets in 1958 and produced an adjustment of the original selling price. Rule 142(a), Tax Court Rules of Practice and Procedure. As our findings of fact clearly indicate, the dissident shareholders wanted their cash investment recovered through the sale of the assets and sought legal advice to that end. With this foremost in their minds, they brought an action for rescission of the asset sale. The parties stipulated to the remedies sought by the shareholders. We find the most significant of these equitable remedies to be the remedy to vacate and set aside the purchase and sale of the brewery assets and the remedy to establish a constructive trust *200 as to any of the transferred assets. During the course of the litigation the issue that surfaced was whether the purchase and sale of the brewery assets should be rescinded in view of the alleged constructive fraud perpetrated by the majority shareholder on the minority shareholders. Efron v. Kalmanovitz,249 Cal. App. 2d 187, 57 Cal. Rptr. 248 (2d Dist. Ct. App. 1967); Efron v. Kalmanovitz,226 Cal. App. 2d 546, 38 Cal. Rptr. 148 (2d Dist. Ct. App. 1964). After a careful review of the record we think petitioner's legal action has its origin in the minority stockholder's claim for rescission. The nature, objectives and defenses asserted in the lawsuit support this. See Boagni v. Commissioner,supra at 713. The mere fact that the sale of the brewery assets was first in the chain of events which led to the litigation is not controlling for determining the origin of the claim settled. United States v. Gilmore,supra at 47-48. We also find that petitioner's evidence on the "true motives" of the minority shareholders in undertaking the derivative lawsuit and in structuring the settlement agreement was of *201 little probative value in light of Woodward and Hilton Hotels. Petitioner's proof of subjective motivation is not apposite in the instant case because such evidence fails to deal with the origin of the claims settled. Woodward v. Commissioner,supra at 577; Entwicklungs & Finanzierungs A.G. v. Commissioner,supra at 760; Redwood Empire S. & L. Assoc. v. Commissioner,68 T.C. 960, 978 (1977). To fully determine the tax character of the settlement payment we must analyze the nexus between the origin of the claim settled and the basis upon which the settlement was reached. Anchor Coupling Co. v. United States,427 F. 2d at 433; Redwood Empire S. & L. Assoc. v. Commissioner,68 T.C. at 978. Thus, the characterization of the $ 2,432,175.45 settlement payment depends upon both the nature of the claims asserted and the actual basis of the recovery. Thomson v. Commissioner,406 F. 2d 1006 (9th Cir. 1969), affg. a Memorandum Opinion of this Court; Spangler v. Commissioner,323 F. 2d at 916. Such a determination must be made by examining the whole record. *202 As stated by the Ninth Circuit in Furrer v. Commissioner,566 F. 2d 1115, 1116 (9th Cir. 1977), affg. a Memorandum Opinion of this Court: Thus, where there is a final judgment * * * the Court must examine both the claims set out in the pleadings and the proof at trial, and the characterization of the judgment by the awarding court. Whether the claims presented and the characterization of the award fit that award into the categories of "caprtal gain" or "ordinary income" is a question of federal tax law. * * * Having considered the claims asserted in the pleadings, we must now examine the characterization of the judgment and settlement amount through an analysis of the state court opinions. The first appeal in the litigation, which reversed the trial court, resulted in the holding that the majority shareholder failed to act in an arm's-length manner with Keller Street; consequently, such conduct amounted to constructive fraud. Efron v. Kalmanovitz,226 Cal. App. 2d at 559-560. On remand, the second trial resulted in the segregation of assets held by Maier Brewing into four distinct categories, with the last three categories of assets held *203 by Maier Brewing as constructive trustee for Keller Street (the trial court excluded the category of assets owned by Mainer Brewing prior to the acquisition of the brewery assets from Keller). Keller appealed this decision and the California Court of Appeals examined the types of judgments that were available to effect restitution between the parties. After holding that a constructive trust is improper as a remedy, unless specific asset categories enumerated by the trial court can be traced to the income generated by the transferred assets, the California Court of Appeals stated (249 Cal. App. 2d 187, 195-196): In order, however, to draw the conclusion and to decree that the assets in categories (c) and (d) were held in trust by S & P [Maier Brewing] for Maier [Keller Street] it was necessary for the court to find what the product (profit) received by S & P [Maier Brewing] from the use of assets obtained by it from Maier [Keller Street] was and that that product went into, that is, ws the source of the assets in categories (c) and (d). * * * The evidence shows that at the time the contract was entered into S & P [Maier Brewing] was engaged in the business *204 of buying, selling and holding for investment real property, leaseholds and other business enterprises; that after the contract was entered into it continued its business and also operated the brewery. Without any finding by the trial court as to the profits realized by S & P [Maier Brewing] in the operation of the brewery and without any finding of the trial court that these profits were invested by S & P [Maier Brewing] in the assets upon which the court imposed a trust, the judgment imposing the trust cannot be sustained.
Maier [Keller Street] is entitled to a judgment in some form which would require S & P [Maier Brewing] to make restitution to Maier [Keller Street] for the product obtained by S & P [Maier Brewing] from the use of the properties which it fraudulently acquired, but whether the remedy provided should be in the form of the imposition of a trust or the imposition of an equitable lien or a money judgment or a combination of these remedies depends, as we have said, on first, proof and finding that there was a product and the amount thereof, second, upon tracing this product into a fund or specific properties either *205 in whole or in part and a finding that the product has been so traced. * * * [Emphasis supplied; fn. ref. omitted.] At the third and final trial the product could not be traced to the respective categories of transferred assets. This lack of an accounting notwithstanding, the court found that in lieu of the product or profit for the use of the assets, Keller was entitled (and as a substitute therefor) to a reasonable amount for such product or profit. Thus, the trial court followed the prescription laid down by the appellate court; that is, if the product cannot be traced then a money judgment is the only remedy available. It arrived at the sum of $ 2,432,175.45 as the measure of this product or profit due Keller. In arriving at this amount the trial court used a rate of interest computed on the fair market value of the transferred assets as of June 29, 1958. [5]
*206 We note that Keller argues on brief that no rescission occurred. At trial, testimony was given by the majority shareholder, Kalmanovitz, that the minority shareholders wanted a dissolution of petitioner in order to recover their cash investment. We believe the minority shareholders wanted a rescission of the sale and the state courts, in effect, obliged them. A close reading of the appellate decision reveals that a rescission of the sale was mandated by the California Appellate Court as stated at 249 Cal. App. 2d 187, 198: Appellants complain of the form of the judgment in that it did not expressly adjudge a rescission of the contract. There is no merit in this contention. A judgment compelling restitution by S & P [Maier Brewing ) to Maier [Keller Street] necessarily involves a setting aside of the contract without any necessity for a formal rescission. The effect of the judgment is to rescind the contract. [Emphasis supplied.] To effectuate a rescission the transferred assets had to be returned. However, the complete commingling of the transferred brewery assets with Maier Brewing's other assets prevented a return of the original transferred *207 assets. Thus, Article I of the trial court's conclusions of law amply demonstrates that because the terms of payment were inequitable to the minority shareholders the contract of sale was rescinded for constructive fraud. We find, therefore, that the nexus between the origin of the claim settled and the basis with which the settlement was reached is that of a claim for rescission with the $ 2,432,175.45 payment made as a direct result of the rescission. Although Keller characterizes the $ 2,432,175.45 as an amount that represents an adjustment to the selling price of the transferred assets and part of the composite settlement, we question whether this sum is properly classified as a settlement amount but is, in substance, an incremental amount arising from a money judgment made as restitution to Keller for the business use of its assets over an extended period of time. If so, then the amount in issue represents a fortiori, payment in restitution for the product or profit of the transferred assets resulting from a rescission. See Spangler v. Commissioner,323 F. 2d at 917. See also 13 Fletcher, Cyclopedia of the Law of Private Corporations, sec. 6040, pp. *208 552-553. Since the assets could not be returned and an accounting could not be made, a money judgment was awarded to Keller based upon the appellate court's directive. Article IV of the trial court's conclusions of law dictate that in lieu of such product or profit Keller is allowed the sum of $ 2,432,175.45 as reasonable compensation for the use by Maier Brewing of the transferred assets during the period subsequent to June 29, 1958, and as a substitute for such product or profit. The trial court's characterizations of the payment as "reasonable compensation," as a "substitute" for the product or profit of the transferred assets, and as payment for the "use of" transferred assets (implying an imputed rent payment) are arguably an attempt by that forum to cast the $ 2,432,175.45 within the definitional framework of ordinary income. It is well settled that an amount received as a "substitute" for ordinary income is taxable as ordinary income notwithstanding the fact that a property right has technically been transferred. See Commissioner v. P. G. Lake, Inc.,356 U.S. 260 (1958). We think, therefore, that the amount in question should be characterized as a payment *209 received for the use of Keller's assets and as a substitute for the product or profit derived therefrom, which is ordinary income, and we so hold. [6]
*210 Keller's contention that the $ 2,432,175.45 is an adjustment to the selling price of the brewery assets disregards the allocation of that amount by the trial court. The trial court allocated the $ 2,432,175.45 as an amount to be paid by Maier Brewing for the use of the transferred assets out of an aggregate judgment of $ 10,858,368.94. In addition to this allocated amount, the judgment was comprised of $ 8,061,193.49 for all the brewery assets (including $ 1,761,193.49 for accounts receivable and inventory) and $ 365,000 for rent on a fixed asset. The trial court also required that the majority shareholder (or Maier Brewing or petitioner) purchase all the shares of stock of the minority shareholders at the agreed and stipulated rate of $ 55 per share. Since the settlement documents, incorporated into the trial court's findings of fact and conclusions of law, made an apportionment of the amount in issue, we will adopt the allocation therein and will not redraft either the settlement documents or the trial court's findings as suggested by Keller. Absent such an apportionment we would be compelled to make an allocation ourselves. Eisler v. Commissioner,59 T.C. 634, 640 (1973). *211 See also DeMink v. United States,448 F. 2d 867 (9th Cir. 1971). Keller refers this Court to Arrowsmith v. Commissioner,344 U.S. 6 (1952), as support for the proposition that the $ 2,432,175.45 received in settlement "relates back" to the original sale of the assets.This amount resulted from a rescission of the original sale and is not an adjustment of a prior valid sales transaction. Furthermore, the trial court's specific approtionment militates against the application of Arrowsmith since it clearly identified the amount in issue as a substitute for the product or profit of the transferred assets. What Keller has failed to prove in the instant case, but necessary for Arrowsmith to apply, is that the settlement payment of $ 2,432,175.45 must be nothing more than an additional portion of the purchase price paid several years later. DuGrenier, Inc. v. Commissioner,supra at 939. In addition, the origin-of-the-claim test demands an analysis of the underlying claim, Arrowsmith notwithstanding. Cf. Bradford v. Commissioner, 70 T.C.     (July 31, 1978); Locke v. Commissioner,65 T.C. 1004 (1976), *212 affd. 568 F. 2d 663 (9th Cir. 1978). Keller also contends that it was never paid the sum of $ 2,432,175.45 and, therefore, should not be taxed on such amount. According to Keller, this contention is substantiated by the fact that two credits of $ 3,000,000 and $ 2,000,000, respectively, reduced the amount in issue to a loss. Thus, Keller argues that the $ 2,432,175.45 was neither paid nor intended to be paid. Under this rationale, no income is realized as a result of the trial court's finding of a rescission. We find no merit to this contention. The credit of $ 3,000,000 is from prior payments under the June 29, 1958, sale contract, including the interest portion of those payments. A $ 2,000,000 credit was allowed for the difference between the fair market value of the substituted addition or improvements to the transferred assets and the fair market value of the transferred assets on June 29, 1958, but since abandoned or removed. These credits affect the form of the payment but they cannot be elevated to the status of altering the substance of the payment. As stated by the Supreme Court in Commissioner v. P. G. Lake, Inc.,356 U.S. 260, 266-267 (1958): *213 These arrangements seem to us transparent devices. Their forms do not control. Their essence is determined not by subtleties of draftsmanship but by their total effect. * * * The substance of the trial court's findings mandated that Maier Brewing was to pay and Keller was to receive $ 2,432,175.45 as a substitute for the product or profit of the transferred assets. To further support this contention Keller offered into evidence a schedule that depicted a loss of $ 1,729,854.41 to Keller as a result of the litigation.It was admitted into evidence only as part of Keller's argument. We have scrutinized the record and cannot find this amount in any of the calculations made by the trial court or in the statutory notice of deficiency sent by respondent. Moreover, the testimonial evidence offered at trial fails to adequately explain this sum or its manner of computation. Respondent correctly notes that this schedule is not based upon any mathematical or generally accepted accounting principle. Therefore, we must find this schedule deficient as probative evidence of the actual amount received by Keller and we accord it minimal weight. In the alternative, Keller argues that *214 it should not be taxed on amounts which, pursuant to the settlement, were destined for the minority shareholders. Keller asserts that to the extent it is required to purchase the stock of the dissident shareholders it acts as a mere conduit for any amounts received from Maier Brewing. Following this logic, the $ 2,432,175.45 payment is assumed to "flow through" to the shareholders. Keller is attempting to persuade this Court that Maier Brewing purchased the minority shareholder's stock through Keller as a result of the trial court's findings. We have examined all the underlying evidence and are not so persuaded. The trial court's findings state that the minority shareholders will be given an opportunity to sell their shares in Keller to either the majority shareholder, or Maier Brewing or Keller. Thus, three separate parties had the obligation to purchase all the shares tendered by the minority shareholders. We perceive an additional factual problem with Keller's "conduit theory." It was stipulated that $ 1,411,960 was actually paid by Keller to the minority shareholders for the shares of stock transferred. Keller claims that, to the extent it was entitled to receive this amount *215 under the settlement, it acted only as a conduct. In addition to the inconsistency in this argument that any amounts received were "passed through" to the shareholders, Keller fails to respond to the question of whether the $ 1,020,215.45, which was never paid to the minority shareholders, is in fact income to it. Keller also confuses the $ 2,432,175.45 which the trial court ordered to be paid by Maier Brewing, as restitution for the use of the transferred assets, with the $ 1,411,960 that the court ordered to be paid by the majority shareholder, Maier Brewing, or Keller, as payment for cessation of the underlying litigation. The trial court and the parties treated these amounts separately. Keller is not free to merge these amounts for the purpose of reducing its taxable income. Therefore, after a careful review of the entire record and for all of the above reasons, we repeat our holding that the $ 2,432,175.45 payment ordered by the trial court to be paid as a substitute for the product or profit of the transferred brewery assets, representing the reasonable compensation to Keller for the use by Maier Brewing of such assets during the period subsequent to June 29, 1958, and *216 is fully includable in Keller's gross income pursuant to section 61. Issue 2. Reasonable Compensation
Respondent contends that for the years in issue, reasonable compensation to petitioner's chief executive officer and majority stockholder, Kalmanovitz, would have been $ 15,000 per year, rather than the $ 90,000 per year actually paid, and that only this amount should be deductible under section 162(a)(1). What constitutes reasonable compensation to a corporate officer is a factual question which must be determined from all the facts and circumstances of the case. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). Pacific Grains, Inc. v. Commissioner,399 F. 2d 603 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694 (1977). The burden of proving reasonableness rests squarely with the petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure.Botany Mills v. United States,278 U.S. 282 (1929); Dielectric Materials Co. v. Commissioner,57 T.C. 587 (1972). *217 If petitioner succeeds in showing that respondent's determination was erroneous, then this Court must determine from the entire record what was reasonable compensation under the particular facts and circumstances presented in the instant case. Pepsi-Cola Bottling Co. of Salina, Inc.,supra at 568. Furthermore, this Court will closely scrutinize any situation where the controlling shareholder can establish his own compensation from the corporation to determine whether such compensation is, in substance, a distribution of corporate earnings and profits in the guise of salaries. Levenson & Klein, Inc. v. Commissioner,supra at 711. See Klamath Medical Service Bureau v. Commissioner,29 T.C. 339 (1957), affd. 261 F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Numerous factors have been considered in determining the reasonableness of compensation. The weight to be accorded such factors varies with the circumstances of each case and no single factor is conclusive. These factors originate from the case of Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949). *218 This case reversed a Memorandum Opinion of this Court, but the several factors enumerated thereunder have been reviewed and applied by this Court on many occasions.
The factors indicated by the Sixth Circuit are the following: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The situation must be considered as a whole with no single factor decisive. To draw the line between what is reasonable and what is excessive *219 is not an easy task. The instant case is no exception. We perceive a number of factors which suggest that the compensation paid to Kalmanovitz for the years in issue was excessive and constituted a dividend distribution to the extent of petitioner's earnings and profits. We are told that as the sole employee Kalmanovitz performed all the accounting and administrative functions for petitioner.However, the underlying nature of his duties changed. He no longer was the president of an active manufacturing company but was the chief executive officer of an active investment company. This is established by the source of the gross receipts for the years in issue. Kalmanovitz opined at the trial that the extent of his principal activities for petitioner involved participation in the defense of the shareholders' derivative lawsuit and development of various real estate projects. Based upon the entire record we find that the nature of the president's duties changed dramatically after the sale of the brewery assets. His managerial duties were far less demanding. For example, prior problems of marketing, production, and personnel vanished upon the termination of petitioner's brewery *220 business. We do not believe that the expansion of the duties associated with the accounting and administrative functions totally supplant these managerial duties. It is well established that an increase in the salary of an officer without a corresponding increase in his corporate responsibilities can be indicative of unreasonableness, albeit not determinative thereof. See, e.g., Pacific Grains, Inc. v. Commissioner,399 F. 2d at 607; Huckins Tool and Die, Inc. v. Commissioner,289 F. 2d 549 (7th Cir. 1961), affg. a Memorandum Opinion of this Court. Therefore, such diminished duties fail to justify a salary increase of $ 90,000 for the taxable years in issue. Furthermore, Kalmanovitz controlled the board of directors and we find that a significant portion of petitioner's gross income was paid to him. Specifically, the ratio of total compensation paid to total gross receipts for taxable years 1966, 1967, and 1968, is 8.39, 13.94, and 5.14 percent, respectively.The compensation paid, when compared to gross income, results in the conclusion that petitioner, to some degree, overcompensated Kalmanovitz. Unfortunately for petitioner, it has failed *221 to introduce any evidence relating to the amounts which would ordinarily be paid for like services by like enterprises under like circumstances. Mayson Mfg. Co. v. Commissioner,178 F. 2d at 119. This failure of proof, while not fatal to petitioner's case, is damaging. See Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. at 569; Faucette Co. v. Commissioner,17 T.C. 187, 196 (1951). Another factor to be considered is that no dividend distributions were made in any of the preceding years. In addition, we note that in the preceding 7-1/2 years to the years in issue petitioner paid no salary to Kalmanovitz. An analysis of petitioner's tax returns for taxable years 1966, 1967, and 1968, discloses that it achieved a modest taxable income in 1966 and suffered a considerable operating loss in 1967 and in 1968. Nevertheless, petitioner had a book value of approximately $ 8,000,000, and an unrestricted cash position for the taxable years in issue. Therefore, petitioner was in the financial position to distribute earnings, if it so desired. See Levenson & Klein, Inc. v. Commissioner,67 T.C. at 714; *222 Dielectric Materials Co. v. Commissioner,57 T.C. at 591. A remaining factor that militates against a finding of reasonableness is that Kalmanovitz was the sole shareholder and president of Maier Brewing Company while simultaneously serving as petitioner's chief executive officer.Since Kalmanovitz was sufficiently compensated for his efforts by Maier Brewing, it is fair to assume that he devoted some portion of his time exclusively to this company and its problems. Kalmanovitz also testified that he was actively involved in a multitude of other activities ranging from real estate developments to brewery acquisitions. While, admittedly, some of these activities may be attributed to petitioner's business, we find that the majority are not and represent a diversion of Kalmanovitz' energy and time from petitioner. On the other hand, certain factors are persuasive that the compensation paid Kalmanovitz by petitioner in 1966, 1967, and 1968, was reasonable. The evidence shows Kalmanovitz to be an exceptional businessman. He is well qualified to manage a complex business enterprise based upon his skills and abilities that were developed through years of business *223 experience. We conclude that, during the years in issue, Kalmanovitz was the sine qua non of petitioner's success. In reaching this conclusion, we have accorded great weight to the fact that he acted as president and general manager of the petitioner and was responsible for substantially every aspect of petitioner's business. It is equally clear from the record that Kalmanovitz worked extremely long hours and devoted a significant portion of these many hours to petitioner. Also, we observe that the salary payments were not a result of fortuitous economic conditions but were attributable, in part, to the extraordinary abilities of Kalmanovitz. One of the factors we must consider in the case of small corporations with a limited number of officers is the amount of compensation paid to the particular officer in previous years. Mayson Mfg. Co. v. Commissioner,178 F. 2d at 119. Over a span of 7-1/2 years Kalmanovitz received nothing for his services. He also controlled the board of directors during this period. Kalmanovitz testified that he "felt" petitioner owed him money for past services.[Tr. 133] While we recognize this as a self-serving statement, the witness's *224 demeanor exhibited a degree of candor and veracity that, in our judgment, supports his statement. Nor are we inclined to find that Kalmanovitz gratuitously performed his services for petitioner during the 7-1/2 years immediately preceding the years in issue. The evidence supports the conclusion that the salary paid in 1966, 1967, and 1968, was, in part, designed to reward Kalmanovitz for services performed in the prior 7-1/2 years and for which he had been underpaid. Compensation for services rendered in prior years but not paid (nor accrued) until the current year is deductible in the tax year when paid. Lucas v. Ox Fibre Brush Co.,281 U.S. 115, 119 (1930); Smoky Mountains Beverage Co. v. Commissioner,22 T.C. 1249, 1255 (1954). A final consideration in the instant case is the absence of any additional fringe benefits or perquisites normally bestowed on corporate officers. Kalmanovitz participated in no qualified or unqualified, pension or profitsharing plan, no vacation, insurance, or welfare benefit plan, and no bonus or stock option plan. Of course, since he was the sole employee group fringe benefits were not feasible. However, the *225 lack of such emoluments buttresses the conclusion that Kalmanovitz' compensation was, in part, not unreasonable. See Levenson & Klein, Inc. v. Commissioner,67 T.C. at 713. Respondent also contends that, notwithstanding the reasonableness of petitioner's salary payments, in whole or in part, such amounts were not paid to Kalmanovitz for personal services actually rendered. It is submitted by respondent that Kalmanovitz performed no services on behalf of petitioner during the years in issue. We disagree. After viewing the entire record, we believe that Kalmanovitz performed valuable personal services for petitioner. The corporate strategy pursued by petitioner belies respondent's contention. The purchase of real estate, the resolution of condemnation proceedings involving specific corporate properties, the sale of securities and inventories of beer, and the coordination of petitioner's defense to the shareholder litigation, were all indicia of an active commercial corporation. As the sole officer-employee, Kalmanovitz designed and implemented petitioner's corporate strategy thereby rendering to petitioner valuable personal services.
We come, therefore, to *226 the point where we must use our judgment, after weighing all the evidence, to reconcile and integrate the factors discussed above to our ultimate conclusions. Because of all the factors and circumstances here present, we have given the issue herein a close scrutiny with the result that we agree with neither petitioner nor respondent. On the basis of the entire record we hold that $ 55,000 for each of the years in issue, 1966, 1967, and 1968, constituted the total reasonable compensation to Kalmanovitz for personal services rendered to petitioner.
Issue 3.Depreciation Deduction
Kalmanovitz (hereinafter petitioner) adopted a useful life of 18 years for the Westminster Shopping Center from the date of its acquisition in 1968. Respondent, on the other hand, relied upon the administrative guidelines established by Rev. Proc. 62-21, 1962-2 C.B. 418, to arrive at a useful life of 35 years for the shopping center. Determination of the shopping center's useful life and the reasonableness of petitioner's depreciation deduction are questions of fact. Matson Navigation Co. v. Commissioner,67 T.C. 938, 944 (1977); Casey v. Commissioner,38 T.C. 357, 381 (1962). *227 Respondent's determinations as to the amounts of depreciation allowable for the years in issue are presumptively correct and the burden of proof rests with petitioner. Bell Electric Co. v. Commissioner,45 T.C. 158, 167 (1965); Dunn v. Commissioner,42 T.C. 490, 494 (1964).
Both petitioner and respondent agree with the description of useful life found at section 1.167(a)-1(b), Income Tax Regs.: (b) Useful life.--For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and *228 other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * [Emphasis supplied.] Furthermore, the Supreme Court defined the useful life of an asset as the period over which it will be useful to a taxpayer in his trade or business. Massey Motors, Inc. v. United States,364 U.S. 92, 98 (1960). See Shainberg v. Commissioner,33 T.C. 241, 254 (1959). Petitioner contends on brief that his shorter useful life is justified by considering the future economic possibilities of the center. This economic obsolescence is a permissible consideration. Sec. 1.167(a)-9, Income Tax Regs.; Zimmerman v. Commissioner,67 T.C. 94, 106 (1976). However, in order for such normal obsolescence to be recognized, petitioner must establish its probability with reasonable certainty. See Dunn v. Commissioner,42 T.C. at 494. Since economic obsolescence is defined in terms of usefulness to petitioner, he must establish with reasonable certainty that the shopping center will have little or no value at the end of the useful life selected. See Zimmerman v. Commissioner,supra at 107. *229 To meet his burden of proof, petitioner introduced the testimony of a witness experienced in conducting retail feasibility studies for government and private industry.For several years preceding this case, petitioner's expert witness performed 20 such studies encompassing a diversity of shopping centers. This expert's testimony focused on a report that he had prepared for petitioner. It involved a market feasibility and economic life analysis of the Westminster Shopping Center and concluded that, based upon marketing and financial analyses, the center would be economically and financially obsolete between 1982 and 1990. Respondent offered no expert witness of his own, but attacked the credibility of the feasibility report via the expert's testimony. We have held that the testimony of an expert witness need not be accepted at face value. Fort Walton Square, Inc. v. Commissioner,54 T.C. 653, 656 (1970). Moreover, an expert's opinion is entitled to substantial weight only if it is supported by the evidence. Casey v. Commissioner,38 T.C. at 381. See Hill v. Commissioner,63 T.C. 225, 250 (1974), affd. per order (9th Cir., Feb. 22, 1977). *230 Respondent argues on brief that the opinions of the "alleged" expert witness are completely unsupportable. We think the feasibility expert was a credible and wellinformed expert witness whose testimony deserves substantial weight. Respondent's characterization of the witness's testimony as irrelevant and inconsistent is not supported by the record. For example, respondent postulates that the witness based his determination of useful life upon a comparison of five competitive retail shopping centers which, upon closer examination, are noncompetitive. To the contrary, the testimony shows that the expert's determination of the useful life was not based upon any comparative evaluation of Westminster Shopping Center with other centers but upon an analysis of the economic future of that center as its future is determined by the competition from other shopping centers. We find that the witness's opinion of the useful life is based upon a variety of factors. He considered, inter alia, the location of the shopping center, its accessibility to major highways, types of tenants within the center, and the future economic potential of the center.Such considerations merit substantial *231 weight and assist us in our determination of useful life in the instant case. Graves v. Commissioner,48 T.C. 7, 14 (1967), affd. per curiam 400 F. 2d 528 (9th Cir. 1968). See Zimmerman v. Commissioner,67 T.C. at 109. In addition, respondent attacks the testimony of petitioner as untenable. The estimate of useful life testified to by those who are personally familiar with the asset and are qualified to give an expert opinion as to its approximate useful life is an additional factor that must be considered with other relevant evidence. Casey v. Commissioner,38 T.C. at 381. Petitioner may testify, based upon his knowledge of the business and familiarity with the particular asset, to support his determination of the center's useful life. [7] The thrust of respondent's argument is that petitioner's determination of the center's useful life was not based on any expert's evaluation at the time of purchase. We refuse to find, as suggested by respondent, that petitioner's testimony lacks probative value. His determination of useful life was based *232 on several decades of experience in the real estate field. [8] Petitioner's manner of selection and development of various properties as shopping centers is well documented in the record. Furthermore, respondent would have us believe that petitioner offered no evidence to support his decision to use an 18-year useful life for the shopping center. Petitioner's testimony shows that he used a reasonable approach in determining the center's useful life. He performed an economic analysis of the center based upon a variety of factors. As the record clearly indicates, it was petitioner's intention to demolish and rebuild the center within 18 years from the date of purchase. *233 Unlike petitioner, respondent offered no expert witnesses but relied solely on Rev. Proc. 62-21, supra, as support for his determination. This revenue procedure provides, in pertinent part, guideline lives for approximately 75 broad categories of assets based upon industry-wide experience as to the useful lives of such assets in each class. Rev. Proc. 62-21 is designed to furnish taxpayers some degree of certainty in determining their depreciation deductions. Matson Navigation Co. v. Commissioner,67 T.C. at 944. Application of the revenue procedure is not mandatory; rather, the taxpayer may elect to use the revenue procedure or have his depreciation deductions examined under previously established procedures. Matson Navigation Co. v. Commissioner,supra at 945. See Pacific Fruit Express Co. v. Commissioner,60 T.C. 640, 643 (1973). After reviewing the whole record, including the quality of the testimony, we think that respondent's determination is unsupported by the weight of the evidence and we find that petitioner is entitled to depreciate the Westminster Shopping Center on the basis of an *234 18-year useful life. [9] Our finding is based upon the evidence submitted by the parties herein and not upon Rev. Proc. 62-21, supra; furthermore, we are not passing upon whether this revenue procedure is a reasonable interpretation of the law. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954. While respondent has not asserted a deficiency against Keller Street Development Company for 1967, the amount of the compensation deduction allowed will have an impact on its net operating loss carryover since Keller Street Development Company experienced a $ 102,286.43 loss in 1967 from operations before the net operating loss deduction and special deductions.↩
2. The total purchase price payable under the terms of the purchase and sale contract was ultimately determined to be $ 7,761,193.49 instead of $ 7,708,605.25.↩
3. Before taking into account the June 3, 1968, judgment, Maier Brewing owed Keller street the sum of $ 6,038,223.35. However, against the total judgment of $ 10,858,368.94, Maier Brewing was allowed credits totaling $ 6,050,000 (including a bottle house with a value of not less than $ 1,050,000 which Keller Street had constructed during the course of the prolonged litigation).↩
4. The gross sales of beer for 1966 and 1967 are not from the beer inventory of Keller Street but resulted from the sale of the remaining beer inventory of Grace Brothers Brewing Company after liquidation of that company's assets on October 1, 1966.↩
5. We disagree with both parties in the instant case on the matter of determining some basis in the trial court's opinion for computing the $ 2,432,175.45 figure. Although the court's opinion is not completely disaphanous on this point, nevertheless, the method↩ of computation is clearly depicted at Articles X and XI in its findings of fact and conclusions of law.
6. We do not reach the question raised in petitioners' brief of whether capitalization of the amount in issue by Maier Brewing (payor) controls the tax consequences to Keller (payee) because said amount is fully includable in Keller's gross income. We note, however, that this Court lacks jurisdiction over the payor. See Rule 13, Tax Court Rules of Practice and Procedure. An attempt was made by the respondent to consolidate Keller's case with the payors but this motion to consolidate met with staunch resistance from petitioners. Respondent's motion was denied on March 19, 1973, and the case of the payor, Maier Brewing Co. v. Commissioner, docket No. 8609-72, is pending before this Court until a final determination is reached in the instant case. Furthermore, Keller argues that since a revenue agent affirmed the tax treatment of the amount in issue by the payor, this is a conclusive determination of the payee's Federal income tax liability. We find no merit in petitioner's argument that a revenue agent's characterization of the amount in issue, upon his initial audit examination, is dispositive of the issue at hand.↩
7. See Williams v. Commissioner,T.C. Memo. 1960-19↩.
8. Respondent raises on brief the question of whether petitioner made a fair allocation of the purchase price to the structures in the shopping center. The issue of allocation never surfaced in either the statutory notice of deficiency or the respondent's pleadings. Moreover, the evidence of allocation offered by respondent is of little probative value in resolving the issue at hand and it is unclear from the record why respondent introduced such evidence at trial.In any event, the question of a proper allocation is not now before this Court.↩
9. We do not reach the question of whether Rev. Proc. 62-21, 1962-2 C.B. 418↩, applies to shopping centers because respondent's determination is not adopted by this Court in the instant case. Assuming, arguendo, that it applied to shopping centers, respondent offers no evidence to support his determination.